IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

KIRK ROBERTS, FARAJI ARTURO COUNCIL,
TERRENCE COLVIN-WILLIAMS, REGINALD BRADLEY,
DAVID COLEMAN and CARL  MCROBERTS, JR., on behalf
of themselves and all others similarly situated,

    Plaintiffs,

v.             Case No.  21-2073-JWB

TRANSAM TRUCKING, INC., OLATHE NOBLE
EQUIPMENT LEASING, INC., and JACOBSON HOLDINGS, INC.,

    Defendants.

**MEMORANDUM AND ORDER**

   This matter is before the court on the following motions and related memoranda: the parties' cross motions for partial summary judgment (Docs. 158, 159, 161, 162, 185, 191, 196, 199); Plaintiffs' motion for conditional certification pursuant to § 216(b) (Docs. 141, 142, 149, 173); Plaintiffs' motion for class certification pursuant to Fed. R. Civ. P. 23 (Doc. 143, 144, 150, 172); and Defendants' motion to strike (Docs. 170, 182, 183).  Defendants' motion for partial summary judgment (Doc. 158) is GRANTED IN PART AND DENIED IN PART.  Plaintiffs' motion for partial summary judgment (Doc. 161), Defendants' motion to strike (Doc. 170), and Plaintiffs' motion to file a sur-reply (Doc. 198) are DENIED.  Plaintiffs' motions for certification (Docs. 141, 143) are GRANTED IN PART AND DENIED IN PART.

**I.  Facts Relevant to Summary Judgment[1]**

---

[1] Because Defendants' motion for summary judgment impacts the court's decision on the motions for certification, the court will rule on the dispositive motions first.  Additional facts relevant to the motions for certification will be discussed in the analysis pertaining to those rulings.

Defendant TransAm Trucking, Inc. ("TransAm") is an interstate and intrastate for-hire motor carrier under authority from the Department of Transportation ("DOT").  Olathe Noble Equipment Leasing Inc. ("ONE") is an equipment leasing company which leases trucks to drivers.  Defendant Jacobson Holdings Inc. ("JHI") is a holding company and TransAm and ONE are wholly owned subsidiaries of JHI.  (Docs. 159 at 6; 185 at 3.)  JHI and ONE do not have motor carrier authority.  When appropriate, the court will collectively refer to all three as Defendants.

JHI has entered into Management and Administrative Services Agreements ("Management Agreements") with both TransAm and ONE.  Under those Management Agreements, JHI provides the following to TransAm and ONE: management and oversight responsibilities; human resources, payroll, employee benefits, and personnel services; project development services, secretarial and clerical services; financial, accounting, billing and collection services; IT support; and management of insurance. (Doc. 186-2.)  The Management Agreements give JHI the authority to "hire, suspend, discharge, and fix and modify the duties, salary or other compensation" of its subsidiaries' employees.  (*Id.* at ¶ 1(b).)  Certain JHI management employees, including the Marketing Coordinator, Vice President of Human Resources, and Director of Recruiting, are eligible for incentives if a certain number of individuals become drivers for TransAm.  (Doc. 186-3.)

Driver Orientation.  Potential drivers for TransAm must attend an orientation program. (Doc. 159-5, McFarland Depo. at 10:17–19.)  There are two different types of drivers: company drivers, which TransAm classifies as W-2 employees, and those who lease a truck and are classified as independent contractors by TransAm.  TransAm knows prior to orientation whether a specific individual is interested in being a company or lease driver.  (Docs. 162 at 4; 191 at 6.) The orientation programs for all drivers are held at the following TransAm locations: Rockwall,

Texas; Tampa, Florida; and Olathe, Kansas.  Typically, individuals who want to become lease drivers attend orientation in Kansas and the company drivers attend orientation in Texas or Florida. (*Id.*)  The orientation program is comprised of at least two days but can last as many as seven days for inexperienced drivers.  Each day lasts approximately seven to seven and a half hours.  (Doc. 159-5, McFarland Depo. at 12:9–22.)  This estimate does not include travel time from the hotel to the training location.  The first two days of training are the classroom component during which the drivers fill out paperwork, are informed about company policies and procedures, and undergo urinalysis drug testing.  (Docs. 162 at 5; 191 at 7.)  During training, the drivers are provided with a Garmin device which is used to record the time spent at orientation.[2]  (Doc. 159-1 at ¶ 9.)  The drivers are instructed on how to use the Garmin device.  (*Id.*)  For the Florida location, the classroom orientation is in the main terminal ("T1"), but the driver orientation is in a location ("T2")  that is approximately 29 miles away from T1.  (Docs. 185 at 11; 199 at 4.)  The Garmin devices are stored at T1.  Although Defendant has introduced evidence that there are also Garmin devices stored at T2 for the times when the drivers are practicing maneuvers at T2, this evidence is contradicted by testimony from McFarland that the devices are stored in the classroom.  (Docs. 185-7, McFarland Depo. 60:7–17; 199-1.)

Driver orientation is mostly conducted by TransAm employees who are titled Orientation Managers and Driver Trainers; however, Plaintiff has introduced evidence that employees of ONE and JHI have been involved in orientation.  (Doc. 185-1, Cochran Depo. at 7:13–8:9; 22:19–23:16; Doc. 185-3, Sybesma Depo. at 79:17–80:1, 81:2–83:23.)  TransAm's Orientation Managers and Driver Trainers in both Texas and Florida promote ONE Leasing and TransAm's Independent Contractor Program to the drivers even though those drivers are typically prospective company

---

[2] Plaintiffs dispute that the Garmin device accurately records all compensable time.  (Doc. 185 at 3.)  The court will discuss the evidence relating to the dispute as to orientation hours *infra*.

drivers.  (Doc. 164-3.)  They further receive a $100 bonus/incentive from ONE for each driver who leases a truck from ONE.  (*Id.*)  The Director of Training and Development also receives a bonus.  (Doc. 164-4.)

Jesse Miller, an employee of TransAm, presents information regarding TransAm's Owner Operator program at orientation in Texas and Florida to prospective company drivers.  Miller does his presentation by telephone from his office in Kansas.  (Docs. 162 at 6; 191 at 8.)  Christina Pope, who is considered an employee of all three Defendants, presents information regarding leasing options through ONE.  (Docs. 159 at 7; 185 at 4; Doc. 185-3, Sybesma Depo. at 79:19–80:1.)  Pope conducts this presentation in person in Florida and by phone in Texas.  (Docs. 162 at 6; 191 at 8.)  Both Miller and Pope use scripts or "guides" that were prepared and approved by Heather Sybesma, an employee of JHI, President of ONE, and Director of Driver Operations for TransAm.  (*Id.*)

TransAm pays for travel expenses and lunch for new drivers coming to orientation although the Company Driver Handbook states that the driver may be responsible for those expenses if the driver resigns prior to working 90 days with TransAm.  (Docs. 159 at 7; 185 at 4; 159-10 at 82.)  Drivers are paid a flat fee per day during orientation.  The fee has ranged from $50 in October 2020 to $80 in 2022.  (Docs. 162 at 4; 191 at 6.)  The drivers who participate in orientation in Texas or Florida are classified as employees and paid for orientation on a W-2 basis.

Between 2018 and 2020, a total of 5,729 drivers were selected for hire after the completion of orientation.  Of those, 3,989 became company drivers and 1,740 became lease drivers.

<u>Leases Drivers and the Agreements.</u>  Lease drivers enter into an agreement called the Independent Contractor Owner-Operator Agreement ("ICA").  The ICA is a lease whereby TransAm leases semi-tractors and driving services from a contractor.  (Doc. 159-2 at 1.)  TransAm

and the contractor are the only parties to the ICA.  The ICA identifies the contractor as "an independent contractor owner-operator who/which owns (and/or leases) motor vehicle equipment and is engaged in the business of transporting freight by motor vehicle pursuant to long term arrangements with for-hire motor carriers."  (*Id.*)  The contractor is to "determine the method, means and the manner of performing [the] obligations [under the ICA] and shall be responsible to [TransAm Trucking] for the performance of this Agreement in accordance with the rules and regulations of appropriate regulatory agencies."  (*Id.* at ¶ 20.)  The ICA does not require the contractor to "purchase or rent any products, equipment, or services from Carrier or Carrier's affiliates as a condition of this Agreement."  (*Id.* at ¶ 18.)  If the contractor leases a tractor through ONE, the contractor is required to purchase physical damage insurance through ONE.  (Doc. 159-19 ¶ 19; 162-11, Miller Depo. at 36:12–19.)  This is done through weekly deductions from earnings.  Drivers who lease from ONE also authorize TransAm to make deductions from compensation for amounts due for the lease payments and expenses and remit those amounts to ONE.  (Doc. 159-2 at 17.)  According to the ICA, TransAm has "exclusive possession, control, and use of the" truck.  (*Id.* at ¶ 1(h).)

TransAm provides public liability insurance at its own expense but contractors are responsible for up to $2,000 for an accident resulting in loss or damage to third parties and/or their property.  (Doc. 159-2 ¶ 9.)  Contractors must also provide bobtail/deadhead[3] insurance and occupational accident insurance.  (*Id.*)  They can elect to purchase this insurance through TransAm and the amount of such insurance is set forth on the insurance addendum.  (*Id.* at 19.)  The ICA also requires contractors to have physical damage coverage.  The ICA states that they have the

---

[3] This insurance is to cover a driver when that driver is "bobtailing," which generally refers to travelling with an empty trailer, or "deadheading," which means that the truck is traveling between assignments and not carrying a trailer.  *See Dietrich v. Albertsons Inc.*, 57 F.3d 1080, 1995 WL 355246, *1 n.5 (10th Cir. 1995) (citations omitted).

option of independently contracting for this coverage or purchasing it through TransAm.  (*Id.* at ¶9.)  The sample insurance addendum, however, does not identify a specific cost for the physical damage insurance, although it does provide a cost for the other insurance options.  (*Id.* at 19.)  The addendum states that the contractor does not have to purchase this insurance through TransAm. Plaintiff has pointed to testimony from Jesse Miller that the physical damage insurance is mandatory.  (Doc. 162-11, Miller Depo. at 36:12–19.)  However, that testimony does not clarify if Miller is talking about all contractors that lease or only those who lease from ONE.  *Id.*  The equipment lease agreement ("ELA") with ONE requires contractors to pay for physical damage insurance, which allegedly represents the cost for the insurance plus an administrative fee.  (Doc. 180 at 13.)  With respect to Roberts, his ELA stated that the amount is $181 per week.  (*Id.*)  That amount changed in later versions of the ELA to $184 per week.  Defendants cite to evidence that only those contractors who lease a truck from ONE are required to purchase ONE's insurance; otherwise, the contractor may purchase physical damage insurance from another provider.  (Doc. 191-1 at ¶ 15.)

Plaintiff Kirk Roberts' ICA states that the charge for his bobtail/deadhead insurance was $10.38 per week.  (Doc. 159-16 at 17.)  That amount was reflected on his settlement statements. (Doc. 159-17.)

The ICA provides that contractors will "be paid a Fuel Surcharge" in accordance with an exhibit that is attached to the ICA.  (Doc. 159-2 ¶ 8.)  The exhibit is a schedule which states that the "fuel surcharge is paid on all dispatched (loaded and empty) miles and runs from Tuesday through Monday."  (*Id.* at 18.)  The schedule includes a column of fuel prices and a corresponding column of the "FSC Per Mile" (Fuel Surcharge Program) to be paid to the contractor when the fuel price is a certain amount.  When the fuel price is below $2.515, the FSC Per Mile shows an amount

contained in parentheses.  (*Id.*)  Although a parenthesis indicates a negative amount, neither the schedule nor the ICA include any term which informs contractors that the Fuel Surcharge Program could result in a chargeback or payment to TransAm from a drivers' wages.  The negative fuel surcharge began in early 2020.  (Docs. 162 at 10; 191 at 11.)  TransAm's marketing materials to drivers tout the fuel surcharge payments as an exceptional benefit to maximize drivers' earning potential.  (Doc. 164-8 at 32.)  Based on a review of the settlements, there were deductions from named Plaintiffs and opt-in Plaintiffs' compensation for the fuel surcharge program.  (Doc. 164-11.)[4]

Contractors also have the option to purchase a "PrePass" service which allows them to bypass some highway scales and pays highway tolls.  The ICA sets forth the cost of the PrePass and does not require contractors to purchase this.  This cost was deducted from Plaintiffs' settlements for those contractors who purchased it.  (Docs. 159 at 13; 185 at 8.)  Contractors could also purchase a fuel optimization program and those costs were set forth in the authorization form.  (Doc. 159-2 at 21.)

Contractors may also fund a Maintenance Savings Account to cover any costs or expenses relating to maintenance of the equipment.  (*Id.* at 2.)  This account is voluntary; however, as discussed, *infra*, contractors are required to fund a "Maintenance/Tire Replacement Reserve" if they lease a truck from ONE.  Interest does not accrue on the funds in the Maintenance Savings Account and there is not a contractual right to an accounting.  (*Id.*)

---

[4] Defendants object to the consideration of the chart detailing the total fuel surcharge deductions for six Plaintiffs on the basis that it has mathematical errors and was completed by Plaintiffs' counsel.  (Doc. 191 at 13.) Defendants have also moved to strike certain paragraphs from the affidavit on the basis that it is an improper affidavit.  (Doc. 170.) The court has reviewed the settlements compendium upon which the affidavit is based.  After review, it is clear that TransAm made deductions for the fuel surcharge from these Plaintiffs.  Based on Defendants' objection, however, the court finds that the amounts of the actual deductions are in dispute.

TransAm must provide the contractor with a weekly settlement and also a final settlement statement following termination of the ICA.  Any deduction from payments must be reflected in the settlement statement.  These deductions can include insurance or other products that a contractor has purchased.  (Docs. 159 at 11; 185 at 7.)  Further, a performance escrow fund must be established in an amount of $500 by a deduction of $50 per week for the first ten settlements. (Doc. 159-2 ¶ 4.)  The escrow fund can be applied to any amount owed by the contractor under several other provisions of the ICA, such as the fuel surcharge program, insurance, fines and penalties, claims, trip interruption, and indemnification.  (*Id.*)  TransAm is to provide an accounting to the contractor at specified times and a contractor can demand an accounting for transactions involving the performance escrow fund at any time.  (*Id.*)  The ICA further provides that interest is to be paid on the fund, identifies the timing and conditions upon which the funds will be returned to the driver, and provides a final accounting.  (*Id.*)

The named Plaintiffs who were lease drivers all obtained their tractors from ONE by entering into an ELA with ONE.  TransAm and JHI were not parties to the ELAs.  Under the ELA, the contractor must make weekly lease payments as well as other payments discussed herein. Similar to the ICA, the ELA requires a performance escrow fund (the "ELA fund").  The ELA fund must reach $700, which is accomplished by deducting $50 per week from the contractor's settlement.  (Docs. 159 at 14–15; 185 at 9.)  The ELA provides that the ELA fund can be applied to any and all amounts owed or payable by Lessee pursuant to the ELA.  (Doc. 159-19 at ¶8.)  An accounting is to be provided on any transactions involving the ELA fund and the lessee can request an accounting.  Further, interest is to be paid on a quarterly basis and said interest may be credited against amounts payable under the ELA.  (*Id.*)  Monies in the ELA fund must be returned to the lessee within 45 days of termination of the ELA; however, the lessee must satisfy all of his or her

obligations under the ELA prior to the return of the funds and the funds may be used to pay those obligations.  (*Id.*)  The terms of the ICA include the obligation to pay the ELA fund by stating that deductions from earnings will include escrow fund obligations to a third party.  (Doc. 159-2 at ¶ 15(j).)  When executing the ICA, drivers who lease from ONE complete a contractor settlement deduction and remittance request form which authorizes deductions by TransAm for payments to be made directly to ONE.  (*Id.* at 17.)  The terms of the ICA further state that if TransAm accepts this authorization then TransAm will comply with the request and the terms of such agreement will be incorporated into the ICA.  (*Id.* at ¶ 19.)

A driver may be paid a lease completion bonus of three cents per mile if the ELA is in effect for the entire term.  (Doc. 159-19 at ¶ 4.)  This bonus is reflected in the final accounting documents after the termination of the ELA.  (Docs. 159 at 16; 185 at 10.)

The ELA also requires the lessee to pay into a "Maintenance/Tire Replacement Reserve" (the "reserve").  (Doc. 159-19 at ¶ 7.)  This is accomplished by paying four cents per mile driven and is deducted from the lessee's weekly settlement by any "motor carrier to which Lessee leases the Equipment."  *Id.*  The amounts deducted for the reserve are recorded on the weekly settlement statements as "ONE MAINT ESCROW MILES."  (*See, e.g.,* Doc. 164-11 at 50.)  The reserve is used to purchase tires and to maintain and repair equipment.  (Doc. 159-19 ¶ 7.)  Upon expiration of the ELA, ONE will retain an amount necessary to perform repairs and preventative maintenance services on the truck and retain an amount equal to the cost attributable to the wear on the tires. (*Id.*)  The reserve may also be used to "offset against any amounts due Lessee."  (*Id.* at ¶ 26.) According to the ELA, drivers may "receive an accounting of transactions involving the reserve at any time upon request."  (*Id.* at ¶ 7.)  Plaintiffs' counsel sought an accounting on behalf of the

named plaintiffs and eight opt-in plaintiffs.  The request was denied on the basis that the contract was terminated.  (Docs. 185-17.)

Plaintiff Reginald Bradley applied for a position with TransAm on or about December 15, 2016.  Bradley last drove for TransAm on January 16, 2017, and his date of separation was January 26, 2017.  (Docs. 159 at 17; 185 at 10.)  David Coleman participated in TransAm's orientation in Florida in October 2019 and then worked as a lease driver until January 2020.  (Doc. 144-14, Coleman Depo. 33:1–13, 39:7–22.)  Terrence Colvin-Williams attended orientation in Florida in January 2020 and worked as a lease driver until April 2020.  (Doc. 144-15, Colvin-Williams Depo. at 43:4–8, 51:16–25.)  Carl McRoberts participated in orientation in Texas in February 2020 and then worked as a lease driver until April 2020.  (Doc. 144-17, McRoberts Depo. at 36:10–13, 46:5–16.)  Kirk Roberts attended orientation in Texas in January 2020 and then worked as a lease driver until October 2020.  (Doc. 144-18, Roberts Depo. at 52:21–53:5.)

Company Driver Hours and Wages.  Company drivers are paid based on the miles driven. (Doc. 144-11, MacFarland Depo. at 32:14–21.)  TransAm then analyzes compensation paid each week to ensure that the drivers are being paid at least minimum wage based on the amount of on-duty time recorded.  (Id. at 33:6–34:16.)  They do this by dividing total compensation by the hours that are recorded as "on-duty" to determine if the hourly wage meets or exceeds the applicable minimum wage.  (Id.)  In the event that wages do not meet minimum wage, TransAm pays drivers an additional sum called a "minimum wage adjustment."  (Id. at 34:20–35:7; see also Docs. 162 at 7; 191 at 8.)

Defendants hired Robert Crandall, MBA, to conduct an analysis regarding Plaintiffs' wage claims.  (Doc. 159-9.)  Plaintiffs assert that they were not paid minimum wages in the weeks that they were at orientation.  They further assert that they were not paid minimum wages because

TransAm does not consider the hours spent in the sleeper berth as compensable time and that they were underpaid during weeks in which TransAm made deductions for a truck rental fee.  A truck rental fee is charged to drivers by TransAm when a driver fails to return their truck to a terminal and TransAm must retrieve the truck.  (Doc. 191-3, McFarland Depo. at 44:12–21.)

With respect to orientation, drivers were paid a flat rate to attend.  To determine whether drivers were paid minimum wages during the weeks of training, Crandall reviewed the drivers' payroll or settlement statements with the hours worked data.  (*Id.* at 8.)  For orientation, the following on-duty hours were reported for the following named and opt-in Plaintiffs:

| Plaintiff | HOS ID | Day 1 | Day 2 | Day 3 | Day 4 | Day 5 | Day 6 | Day 7 |
|---|---|---|---|---|---|---|---|---|
| Roberts | ROBK05 | 7:30 | 6:42 | 5:32 | 5:34 | 7:51 | 6:41 | 0:00 |
| Curtis (2018) | CURJOH | 7:30 | | | | | | |
| Curtis (2019) | CURJOH | 7:30 | 2:54 | 0:00 | 0:00 | | | |
| Colvin-Williams | COLTE | 8:00 | 6:31 | 6:20 | | | | |
| Coleman | COLD16 | 8:00 | 6:13 | 5:44 | 3:47 | | | |
| McRoberts | MCRCA | 7:30 | 6:12 | 7:48 | 5:06 | | | |

(Docs. 164-6; Doc. 185 at 12; 199 at 5.)

After using the on-duty hours reported by TransAm, Crandall determined that all drivers, including the named Plaintiffs identified in the chart above, were paid at least minimum wage in every relevant week.  (Doc. 159-9 at 9.)  Plaintiffs dispute this opinion on the basis that Crandall relied on erroneous data, included lease driver income in his analysis, and included subsequent payments made to drivers in an attempt to cure the FLSA violation.  Plaintiffs challenge the hours recorded on the basis that it conflicts with Defendants' assertion that orientation lasts 7 and a half hours each day[5] and that the Garmin devices were not capturing all compensable time.  The court will discuss these disputed issues *infra*.

---

[5] Defendants' proffered fact regarding orientation is that it lasts "approximately 7.5 hours per day," although that is qualified by the statement that the actual time is recorded on the Garmin devices.  (Doc. 159 at 6.)

After drivers are hired and complete orientation, company drivers enter their duty status on an electronic logging device ("ELD"). The information drivers input into the ELD is maintained by TransAm in an "hours worked" document. TransAm pays drivers for time logged on as "on duty" and instructs drivers that they must be on duty when performing work for the company. (Doc. 159-10 at 159.) TransAm's handbook explains when a driver is off duty. The policy states as follows:

> TransAm relieves its drivers of all duties and responsibilities for the care and custody of the vehicle, its accessories and any cargo it may be carrying when not performing company duties. You must be On Duty when performing work for the company. When you walk into the building to give the customer your paperwork or receive paperwork, or you are on the dock watching or loading/unloading your load, you must be On Duty. If you are broken down over the road and you are waiting for a service vehicle, you must be On Duty until you are relieved of all duties for the care and custody of the vehicle, its accessories and cargo. Anytime you are not performing work for the company, TransAm relieves you of all duties and responsibilities for the care and custody of the vehicle, its accessories and cargo. You are free to pursue any activity of your choosing. When you are waiting to load or unload your load, you are required to put yourself Off Duty or in the Sleeper if you are not required to be on the dock. The same applies when your tractor is being serviced. Other examples include traveling to and from home, etc. If driving, you should select the Personal Conveyance duty status on your ELD. If not driving, you select the Off Duty or Sleeper status on your ELD. (DOT Interpretation 395.2)

(*Id.*)

TransAm's handbook further sets forth a driver's job duties which include promptly reporting accidents, maintaining constant care of the refrigeration unit, and to report any mechanical failure.[6] (*Id.* at 46–47.) TransAm states that these requirements apply when drivers

---

[6] Plaintiffs contend that drivers must respond to alerts automatically generated by TransAm's systems while in the sleeper berth. (Doc. 185 at 13.) This fact is supported by a text message that stated "I HAD TO BREAK MY SLEEPER BERTH CAUSE THE REEFER HAD A LOW FUEL ALARM." (Doc. 185-14.) Reefer is a term used to describe a refrigerated truck. Defendants dispute this fact and have introduced evidence that off duty drivers are not required to respond to alerts. (Doc. 199-3.) Plaintiffs' contention that drivers must respond to alerts at all times is not supported by the evidence submitted. There is no evidence that TransAm required this driver to break his sleeper berth on this occasion. Further, TransAm states that it monitors refrigeration alerts and sends out a third party to address any issues. In light of the lack of context of this text message, Plaintiffs have failed to establish that drivers must respond to all alerts while in the sleeper berth.

are on duty and that they are relieved of these requirements when they are off duty.  (Doc. 199-3.)

TransAm's drivers are never on duty for more than 24 hours and the company drivers do not drive

in teams.  (Docs. 159 at 8; 185 at 5.)  When a driver is sleeping in the sleeper berth, the driver will

log the time as "sleeper berth."  If a driver is sleeping somewhere other than the sleeper berth, the

time will be logged as "off duty" on the ELD.  (Doc. 159-1 ¶ 16.)

  <u>Claims brought by all Plaintiffs.</u>  Plaintiffs, who are lease and company drivers, filed this

action against Defendants alleging the following claims: 1) failure to pay minimum wage in

orientation in violation of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201; 2) failure to

pay Florida minimum wage during orientation in violation of Section 448.110 of the Florida

Statutes; 3) unfair and deceptive practices in violation of the Kansas Consumer Protection Act

("KCPA"), K.S.A. § 50-626 and § 50-627; 4) unlawful deductions in violation of the Kansas Wage

Payment Act, K.S.A. § 44-314; 5) failure to pay minimum wages for lease drivers in violation of

the FLSA (misclassification claim); 6) failure to pay minimum wages for company drivers in

violation of the FLSA; and 7) violations of the Truth-in-Leasing Act ("TIL"), 49 U.S.C. §

14704(a).  (Doc. 109 at 50–53.)  With respect to the FLSA claims, Plaintiffs also bring claims on

behalf of similarly situated employees and now move to conditionally certify those claims as a

collective action.  (Doc. 141.)  With respect to the remaining claims under state law and the TIL,

Plaintiffs allege class claims and now seek to certify those claims as class actions under Federal

Rule of Civil Procedure 23.  (Doc. 143.)

  Defendants move for partial summary judgment on Plaintiffs' claims under the KCPA, the

TIL, and for failure to pay minimum wages for orientation and for company drivers.  (Doc. 158.)

Defendants also seek summary judgment on Plaintiff Reginald Bradley's claims on the basis that

they are barred by the statute of limitations.  Plaintiffs move for partial summary judgment on their

FLSA and Florida state law claims regarding failure to pay minimum wages during orientation, their FLSA claim that TransAm failed to pay company drivers minimum wages when they applied a truck rental fee to drivers, their KCPA claim with respect to certain acts, and their TIL claim with respect to certain acts.

Defendants have also moved to strike paragraphs 3–39 of Plaintiffs' counsel's affidavit in support of summary judgment on the basis that it is an improper affidavit and not admissible evidence. (Doc. 170.) As discussed herein, certain aspects of the affidavit are based on assumptions and, therefore, are not admissible evidence. Further, as discussed herein, some paragraphs are supported by other evidence cited therein. The court declines to address every paragraph in the affidavit even though the parties have heavily litigated the propriety of those paragraphs. To the extent that the facts supported by the affidavit are material to the court's decision, those facts have been addressed and viewed in Plaintiff's favor if they were supported by the record or personal knowledge and not based on assumptions. Fed. R. Civ. P. 56. Defendants' motion to strike (Doc. 170) is denied[7] and Plaintiffs' motion to file a sur-reply (Doc. 198) is denied as moot.

## II.    Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–

---

[7] The court previously granted alternative relief to Defendants on their motion by allowing them additional pages in their response brief. (Doc. 184.) The court took the matter under advisement, however, with respect to Defendants' request to strike certain portions of the affidavit.

48 (1986).  "A fact is material if, under the governing law, it could have an effect on the outcome

of the lawsuit.  A dispute over a material fact is genuine if a rational jury could find in favor of the

nonmoving party on the evidence presented." *Doe v. Univ. of Denver*, 952 F.3d 1182, 1189 (10th

Cir. 2020) (quoting *Jones v. Norton*, 809 F.3d 564, 573 (10th Cir. 2015)).  Conclusory allegations

are not sufficient to create a dispute as to an issue of material fact.  *See Hall v. Bellmon*, 935 F.2d

1106, 1110 (10th Cir. 1991).  The court views the evidence and all reasonable inferences therefrom

in the light most favorable to the nonmoving party.  *LifeWise Master Funding v. Telebank*, 374

F.3d 917, 927 (10th Cir. 2004).

## III.   Analysis

### A.  Summary Judgment

### i.      KCPA Claims

In  Count  III,  Plaintiffs  allege  that  Defendants  TransAm  and  JHI  violated  the  Kansas

Consumer Protection Act ("KCPA") by engaging in unconscionable and deceptive practices in

connection with their recruitment of drivers.  (Doc. 109 at 16–23.)  The KCPA provides that "[n]o

supplier shall engage in any deceptive act or practice in connection with a consumer transaction"

and that "[n]o supplier shall engage in any unconscionable act or practice in connection with a

consumer  transaction."  K.S.A.  §  50-626(a);  §  50-627(a).   A  "consumer"  is  defined  as  "an

individual, husband and wife, sole proprietor, or family partnership who seeks or acquires property

or services for personal, family, household, business or agricultural purposes."  *Id.* § 50-624(b).

The KCPA defines a "Supplier" as "a manufacturer, distributor, dealer, seller, lessor, assignor, or

other person who, in the ordinary course of business, solicits, engages in or enforces consumer

transactions, whether or not dealing directly with the consumer."  *Id.* § 50-624(l).  The KCPA also

defines a "consumer transaction" as "a sale, lease, assignment or other disposition for value of

property or services within this state, except insurance contracts regulated under state law, to a consumer; or a solicitation by a supplier with respect to any of these dispositions." *Id.* § 50-624(c). The term "value" has been interpreted as the "money that something will command in an exchange." *Berry v. Nat'l Med. Servs., Inc.*, 41 Kan. App. 2d 612, 622, 205 P.3d 745, 752 (2009), *aff'd*, 292 Kan. 917, 257 P.3d 287 (2011) (quoting Black's Law Dictionary 1586). Therefore, a consumer transaction is a sale or lease of property or services by a supplier in exchange for money from a consumer.

The KCPA sets forth nonexclusive lists of what constitutes deceptive and unconscionable acts. *See* K.S.A. § 50-626(b)(1)-(14); § 50-627(b)(1)-(7). To succeed on a claim, Plaintiffs must prove that (1) they were consumers; (2) Defendants were suppliers; (3) Defendants engaged in a deceptive or unconscionable act or practice in connection with a consumer transaction; and (4) Plaintiffs were aggrieved. *In re Motor Fuel Temperature Sales Pracs. Litig.*, 279 F.R.D. 598, 604-05 (D. Kan. 2012).

Turning to the allegations, Plaintiffs allege that Defendants' deceptive and unconscionable acts occurred in connection with their recruitment to be drivers and with respect to the terms and conditions of the agreements. Plaintiffs allege that TransAm recruiters tell Plaintiffs that company driver jobs are all available. As a result, the named Plaintiffs attended orientation in hopes of becoming a company driver and offering their driver services to TransAm as employees. TransAm then pressured Plaintiffs and other drivers into switching from a company driver to a lease driver. (Doc. 109 ¶ 87.) TransAm also allegedly makes misrepresentations to drivers and omits material facts during these recruitments. Plaintiffs allege that Defendants took "advantage of consumers who have attended multi-day driver orientation programs far from their homes based on representations" and then pressured them to become "lease drivers." (*Id.* ¶ 3.) Plaintiffs further

16

allege that TransAm agents informed Roberts after orientation that there were no trucks available for company jobs but that he could wait for a truck or sign up as an independent driver to start driving right away. (*Id.* ¶ 88.)  As an independent driver for TransAm, the driver is not required to lease from ONE but can lease a tractor from any entity or may use his or her own tractor. (Doc. 191-1 ¶ 15.)

Plaintiffs allege that the drivers are consumers under the KCPA. (Doc. 109 ¶ 3.)  Plaintiffs further allege that Defendants are suppliers because they "solicited and engaged in consumer transactions – that is, the sale, lease, and assignment for value of property or services – as part of their ordinary course of business." (*Id.* ¶ 30.)  Notably, the amended complaint alleges that the consumer transaction that is the subject of their KCPA claim is the "recruitment of individuals to attend orientation and provide services as truck drivers for Defendants." (*Id.* ¶ 116.)

Both parties move for summary judgment on this claim.  Plaintiffs move for partial summary judgment and Defendants move for summary judgment on the basis that Plaintiffs are not consumers and the relationship between the parties is not a consumer transaction.

Defendants initially argue that Plaintiffs' claim is outside the KCPA because the parties are in an employment relationship and disputes arising from such relationships do not qualify as a consumer transaction.  In support, Defendants cite to decisions of other courts which interpret consumer protection statutes of states other than Kansas.  The court declines to rely on these decisions and further declines to categorically rule that transactions in an employment relationship cannot be subject to the KCPA.  After review, the court finds that the agreements at issue do not fall under the KCPA given the facts of this case.

Defendants argue that the transaction is not a consumer transaction and Plaintiffs are not consumers under the KCPA.  Essentially, Defendants argue that Plaintiffs were not consumers

because they were offering their services to TransAm as drivers.  As a result, they do not fall under the definition of consumer under the KCPA.  Under the KCPA, a consumer is an individual who seeks or acquires services or goods for personal or business use.  Plaintiffs' amended complaint cast their claim as one in which Plaintiffs were offering their services to TransAm as drivers. Clearly, Plaintiffs were seeking to be paid by TransAm for their services.  As a result, such allegations do not amount to a consumer transaction.  Plaintiffs were the party selling their services in exchange for payment.  Plaintiffs were not seeking to acquire any services or equipment from TransAm when they went to orientation.  Such a transaction is not a consumer transaction because Plaintiffs do not meet the definition of consumer.

Recognizing that characterizing the consumer transaction in such a way would negate their claims, Plaintiffs now assert that the consumer transaction is the ELA signed by the lease drivers and, as a result, they are consumers because they leased trucks from ONE in exchange for value. (Doc. 162 at 21.)  Plaintiffs also argue that the execution of the ICA is also part of the consumer transaction because they obtained "services" from TransAm in the form of "certain personnel services," such as insurance.  (*Id.*)[8]

In arguing that the execution of the lease of the truck is a consumer transaction, Plaintiffs merely point to the language in the statute and state that Plaintiffs leased a truck in exchange for deductions from their weekly settlement statement which qualifies as a consumer transaction. With respect to the ICA, Plaintiffs argue that the drivers gave "value" to the lease driver relationship by agreeing to have "significant amounts of money deducted from their earnings each week for lease payments, insurance deductions, escrow funds, and other services."  (Doc. 185 at

---

[8] While this revised definition of consumer transaction is not contained in the amended complaint, liberally viewing Plaintiffs' amended complaint shows that Plaintiffs did make allegations regarding deceptive and unconscionable conduct with respect to these agreements.  Therefore, the court will proceed to evaluate their claim in light of their recharacterization of the consumer transaction.

20.)  Plaintiffs' recharacterized consumer transaction continues to suffer the same flaws as the transaction that is characterized in the amended complaint.

At the heart of the transaction between the parties here is the driver relationship.  Plaintiffs sought to become company drivers for TransAm.  By doing so, Plaintiffs sought to receive money from TransAm for performing services.  Plaintiffs did not seek to acquire or purchase a truck or insurance products from Defendants.  That is clear from the alleged formation of the relationship.  At orientation, Plaintiffs decided to become independent contractors for TransAm.  Although the specific facts regarding each named Plaintiffs' decision are not set forth in the summary judgment motions, the amended complaint contends that they were pressured into doing so because there were no company trucks available.  Even viewing these allegations as true here, the relationship has not shifted at this point into one in which Plaintiffs are now consumers.  Rather, Plaintiffs continued to offer their services to TransAm and, in return, they sought payment for those services.  As a result, TransAm requires Plaintiffs to execute the ICA.  It is undisputed that the terms of the ICA offer various services available to purchase and it is further undisputed that the lease drivers purchased some of those services or products.  The fact that Plaintiffs purchased an insurance product as part of the terms of the ICA does not transform this transaction into a consumer transaction.  As discussed, a consumer is one who exchanges value for goods or services.  With respect to the ICA, Plaintiffs are contracting to perform services for TransAm in exchange for money.  They are also giving value (money) by having their weekly settlement deducted for insurance and other items related to their driving obligations.  But, the nature of the underlying transaction is not a consumer transaction.  Rather, it is the contract to provide services to TransAm.

In *Neufeldt v. Cargill, Inc.*, No. 103,436, 2011 WL 1376995, 249 P.3d 468 (Kan. Ct. App. Apr. 8, 2011), the Kansas Court of Appeals affirmed a trial court finding that the plaintiff was not

a consumer but rather a supplier in a transaction that involved the sale of wheat.  The plaintiff attempted to bring his claim under the KCPA by arguing that although he contracted to sell the wheat he also contracted for the defendant's marketing services.  The court held that the plaintiff was a supplier and that the case was really about the sale of the wheat.  *Id.* at *6.  In this case, Plaintiffs are contracting to provide services to TransAm as independent drivers.  Although the ICA may include provisions regarding deductions from pay for certain products, at bottom, the transaction is about Plaintiffs contracting their services to TransAm.  Therefore, Plaintiffs are not consumers and it is not a consumer transaction as the ICA is primarily about Plaintiffs selling their services to TransAm for payment.

The result is the same for the ELA.  Plaintiffs entered into the ELA as a result of their independent contractor relationship with TransAm and because they did not have their own truck to provide the required services under the ICA.  As discussed *infra*, the ELA is incorporated into the ICA as the ICA expressly provides as such and the ELA contemplates that the driver will lease his services and the truck to a carrier.  In *Neufeldt*, the parties subsequently entered into a promissory note after the plaintiff defaulted on his obligations under the contract to sell the wheat. The plaintiff argued that the promissory note was a consumer transaction.  The court did not agree. Notably, the court of appeals held that the promissory note was not a consumer transaction because it arose from the grain contract in which the plaintiff was not a consumer but a supplier.  "If the underlying transaction is not a consumer transaction, the execution of or attempt to collect on a promissory note arising out of it is not one either."  *Neufeldt,* 2011 WL 1376995, *7.  Here, Plaintiffs entered into the ELA in order to perform their obligations under the ICA. Plaintiffs are not consumers in the transaction concerning the ICA and, therefore, cannot be consumers under the ELA as that lease was executed in connection with their obligations to perform under the ICA.

To hold otherwise would expand the purpose of the KCPA which is to protect consumers in consumer transactions.  Plaintiffs cannot extract one agreed-to obligation to pay for insurance out of the ICA and claim it was a consumer transaction as the primary purpose of that agreement is for Plaintiffs to obtain money for their services.

Defendants' motion for summary judgment on Plaintiffs' claim under the KCPA is granted.

### ii.   Minimum Wage Claims

#### a.  Orientation

Defendants and Plaintiffs move for summary judgment on Plaintiffs' claim of failure to pay minimum wages to drivers for hours spent at orientation.  Under the FLSA, employers must compensate employees with at least a specified minimum wage for every hour worked.  29 U.S.C. § 206(a).  For orientation, TransAm pays drivers a flat fee for attending orientation.  This fee ranges from $50 to $80 per day.  Defendants have put forth evidence in the form of expert testimony that TransAm paid minimum wages to all drivers for orientation.  Plaintiffs, however, dispute this evidence.  First, Plaintiffs argue that the records utilized by the expert are in dispute because the Garmin devices did not accurately capture all compensable time.  Reviewing the time records that contain the on-duty time logs, Day 1 for the named Plaintiffs all recorded the time in orientation ranging from 7 ½ hours to 8 hours.  (Docs. 164-6; Doc. 185 at 12; 199 at 5.)  This is consistent with Defendants' employees who state that orientation lasts from 7 to 7 ½ hours a day. (Doc. 159-5, McFarland Depo. at 11:12–18 ("It's approximately seven and a half hours a day."), 12:9–10 ("It's about – it's about the same -- about seven, seven and a half hours per day, for two days."); Doc. 159-1, McElliott Aff. ("TransAm's orientation program lasts at least two days, to as many as seven days, lasting approximately 7.5 hours per day."))  The time recorded on the Garmin devices by TransAm for days 2 through 7, however, is not entirely consistent with that evidence.

Rather, according to the Garmin records, the time spent in training ranges from 2:54 to 7:51.[9] Notably, of the seventeen recorded training dates for the named Plaintiffs on days 2 through 7, only two logs record that orientation lasted longer than seven hours on a given day.  (Docs. 164-6; Doc. 185 at 12; 199 at 5.)  Therefore, at this time, Plaintiffs have raised a dispute as to whether Defendants have accurately reported the named Plaintiffs' hours during orientation.  Because Defendants' expert has relied on this data to formulate his opinion as to whether TransAm paid drivers minimum wages during orientation, the court finds that Defendants have not established that the named Plaintiffs were all paid at least minimum wages for orientation.  Therefore, they are not entitled to summary judgment on this claim under the FLSA and Florida law.

Plaintiffs also move for summary judgment on this claim.  Plaintiffs, however, have not established that they are entitled to judgment.  Plaintiffs' evidence on this fact is based on calculations regarding the hours worked.  *See* Doc. 163, Smit Aff. ¶ 23.  Defendants object to these calculations in the affidavit on the basis that they are improper evidence because Plaintiffs' counsel is not an expert and based on assumptions.  The court agrees.  Plaintiffs' calculations regarding their FLSA and Florida minimum wage calculations are based on several assumptions made by Plaintiffs' counsel and their use of 7 ½ hours for each orientation day even though there is evidence that training could be from 7 to 7 ½ hours.  *See* Doc. 163, Smit Aff. at ¶¶ 6 ("I used TransAm's own records of orientation days from these payroll records and multiplied these amounts by 7.5 to arrive at total orientation hours for each workweek for each plaintiff and opt-in plaintiff."), 12 ("If a driver's first day of orientation was a Monday, then I assumed that they attended TransAm's 7-day orientation for inexperienced drivers. This means that they should have been paid for four days

---

[9] There are also three days where the recorded time is identified as 0:00 hours for Roberts and Curtis.  There is no additional fact regarding these on duty logs.  Therefore, it is unclear if Roberts and Curtis attended orientation and no hours were logged or if they did not attend orientation on those dates.  If it is the former, this further supports Plaintiffs' position that the Garmin devices did not accurately log the time spent in orientation.

of orientation (Monday through Thursday) in their first paycheck"), 13 ("If a driver's first day of orientation was a Wednesday, then I assumed that they attended TransAm's shorter orientation for experienced drivers. This means that they should have been paid for two days of orientation (Wednesday and Thursday) in their first paycheck and for one day of orientation (Friday) in their second paycheck.")   Therefore, this evidence is inadmissible and cannot be considered in determining whether Plaintiffs are entitled to summary judgment on their claims.  Plaintiffs have not put forth undisputed evidence with respect to the amount of hours the named Plaintiffs worked during orientation.  Further, they have not set forth undisputed evidence that the named Plaintiffs were not paid minimum wages for the compensable hours they worked during orientation. Therefore, because there are disputes as to the compensable hours the named Plaintiffs attended orientation and whether they were paid minimum wages in accordance with the FLSA, Plaintiffs' motion for summary judgment on the FLSA claim is denied.  Further, the parties' motions for summary judgment on Plaintiffs' state law claim for failure to pay Florida minimum wages are denied for the same reasons.

### b.  Sleeper Berth

In Count VI, Plaintiffs allege that TransAm failed to pay them minimum wages in violation of the FLSA.  Plaintiffs argue that TransAm failed to pay minimum wages because they did not count the time in the sleeper berth as compensable time under the FLSA.  Defendants move for summary judgment on the basis that this is not compensable time because Plaintiffs are not required to be on duty while they are in the sleeper berth.  In support of their argument that they should be paid for the time in the sleeper berth, Plaintiffs point to DOL regulations and a DOL opinion letter.

There are several regulations that have been promulgated by the Department of Labor to assist in determining what hours are compensable under the FLSA.  Directly relevant here, an employee may be "considered to be working even though some of his time is spent in sleeping." 29 C.F.R. § 785.20.  Further, § 785.21 states that an "employee who is required to be on duty for less than 24 hours is working even though he is permitted to sleep or engage in other personal activities when not busy."[10]  Under 29 C.F.R. § 785.41, "[a]ny work which an employee is required to perform while traveling must, of course, be counted as hours worked.  An employee who drives a truck, bus, automobile, boat or airplane, or an employee who is required to ride therein as an assistant or helper, is working while riding, except during bona fide meal periods or when he is permitted to sleep in adequate facilities furnished by the employer."

Plaintiff argues that, taken together, sections 785.21 and 785.41 require TransAm to pay their drivers for all time in the sleeper berth.  First, Plaintiff asserts that the Department of Labor has issued an opinion letter indicating that the "time spent by truck drivers in the sleeper berths of their trucks [is time spent] 'on duty' as a matter of law."  (Doc. 185 at 26.)  In support of that assertion, Plaintiffs cite to language in the DOL opinion letter that states, "In other words, a long-haul driver in a truck cab is considered to be on duty under IB 785 regardless of whether he is driving, sitting beside the driver, or in the sleeper berth.  Where such an employee is on duty for 24 hours or more, IB 785.22 permits bona fide meal periods and up to 8 hours of sleeping time to be deducted from the computation of hours worked."  (WHD Opinion Letter SCA-118, June 22, 1979, at Doc. 162-1 at 3.)  The preceding paragraph in that letter, however, discussed that the truck drivers were "on duty" because they were in a place "they would not be if they had been totally

---

[10] When an employee is on duty for 24 hours or more, the most that can be ascribed to eating and sleeping (non-compensated time) is 8 hours. 29 C.F.R. § 785.22.  The parties agree that § 785.22 is not applicable here because the drivers are not on duty for more than 24 hours.  Therefore, the pertinent regulation is § 785.21.

free to do what they pleased." (*Id.*)   The letter reasoned that this requirement arose from the Supreme Court's decisions in *Armour v. Wantock*, 323 U.S. 126 (1944) and *Skidmore v. Swift*, 323 U.S. 134 (1944).   (*Id.* at 1, 3.)   Having reviewed both of those cases, the court can confidently assert that those cases say nothing of the sort.   They dealt with firemen who had to be on site and on call at a moment's notice in case of a fire.   The decisions could not possibly translate to the circumstances of long-haul truck drivers in the manner asserted by the Department of Labor in its letter.   Thankfully, the judicial power is vested in the courts, not administrative agencies like the Department of Labor.   *See* U.S. Const. Art. III.   Accordingly, erroneous opinions of an administrative agency will be ignored.

In this case, and quite to the contrary of the facts in *Armour* and *Skidmore*, the evidence is that the drivers can sleep in a sleeper berth, a hotel, or a family member's house.   TransAm does not care where they sleep and what they are doing when they are off duty.   Moreover, to the extent the court would give any weight to the DOL opinion letter, that letter did not unequivocally state that drivers in a sleeper berth are always on duty.   Rather, the DOL opinion letter made clear that a driver is not "on duty" and not engaged in compensable activity when he is "completely relieved of all duties and responsibilities, is permitted to go where he pleases, knows in advance that he will not have to resume work until a specified time, and if the period is of sufficient length to be used for the employee's own purposes." (*Id.* at 1.)   These factors appear to be directly taken from the regulation pertaining to the definition of "off duty" which is contained in the section on "waiting time."   *See* 29 C.F.R. § 785.16.   The opinion letter further refers to these factors in determining whether other breaks during a truck route are compensable.   (*Id.* at 4.)   What is apparent from all this is that it is a fact inquiry as to what is or is not required of the driver during

this time.  Plaintiff fails to cite any binding authority for the proposition that all time spent in the sleeper berth is compensable time here.

In this case, it is undisputed that TransAm has a policy regarding drivers' duties.  Under that policy, drivers are to log their time as off duty or in the sleeper berth when they are sleeping.  The only evidence submitted by Plaintiffs in support of their argument that they have to be "on duty" while in the sleeper berth is a citation to the handbook describing a driver's duties generally.  However, the handbook further states that a driver is relieved of all duties when that driver is off duty or in the sleeper berth.  Although there are several opt-in Plaintiffs in this suit, they have not put forth any evidence which indicates that TransAm requires them to be on duty even though they recorded their time as sleeper berth or off duty when they were sleeping.

Plaintiffs further argue that a sleeper berth is not an adequate facility for sleeping under the regulation and therefore their time sleeping is compensable.  (Doc. 185 at 27.)  In support of this assertion, Plaintiffs cite to the Department of Labor's Field Operations Handbook § 31b12(c) which discusses basic sleeping amenities.  Plaintiffs, however, ignore § 31b09 which states that "[b]erths in trucks are regarded as adequate sleeping facilities for the purposes of 29 CFR 785.41."  Further, courts have held that the time spent sleeping in a berth is presumably not compensable under the regulation.  *See Blodgett v. FAF, Inc*., 446 F. Supp. 3d 320, 328 (E.D. Tenn. 2020) (citing *Petrone v. Werner Enterprises, Inc*., 2017 WL 510884, *7 (D. Neb. Feb. 2, 2017) (holding that "under the plain language of the regulations, time in the sleeping berth is presumably non-compensable under § 785.41") and *Kennedy v. LTI Trucking Servs., Inc*., 2019 WL 4394539, *3 (E.D. Mo. Sept. 13, 2019) ("[p]laintiff is not entitled to the presumption that her sleeper berth time was compensable")).  The case cited by Plaintiffs, *Browne v. P.A.M. Transp., Inc*., No. 5:16-CV-5366, 2018 WL 5118449 (W.D. Ark. Oct. 19, 2018), is distinguishable because the court was

26

discussing the interplay between §§ 785.22 and 785.41. *Blodgett*, 446 F. Supp.3d at 328. Here, there is no evidence Plaintiffs were on duty for 24 hours a day, and it is undisputed that Plaintiffs are not required to be on duty when they are in their sleeping berths to sleep.

Therefore, Defendants' motion for partial summary judgment on Count VI with respect to the claim pertaining to the sleeper berth is granted.

### c. Truck Rental Fee

In their third amended complaint, Plaintiffs allege that company drivers were also not paid minimum wages due to the time spent when the truck is stopped but the drivers remain responsible for their trucks and on-call time while waiting for dispatch to assign the driver a load. (Doc. 109 at ¶152.) Defendants have moved for summary judgment on these claims. In response, Plaintiffs argue that Defendants' expert identified three instances where a driver was not paid minimum wage in a week due to a truck rental fee. (Doc. 185. at 29.) Plaintiffs fail to address Defendants' arguments regarding their allegations pertaining to waiting time nor have they put forth any evidence of unpaid wages based on these allegations. Therefore, any minimum wage claims based on these allegations are waived.

Plaintiffs have moved for summary judgment on their unpaid minimum wages as a result of the unlawful truck rental fee deduction. (Doc. 162 at 19–20.) TransAm charges a truck rental fee (up to one dollar per mile) when drivers do not return their truck to a terminal. (Doc. 191-3, McFarland Depo. at 44:12–21.) According to Crandall, he analyzed Plaintiffs' claim of the failure to pay minimum wages by reviewing the payroll or settlement statements of the named and opt-in drivers. (Doc. 162-22.) Crandall first determined an effective hourly rate by dividing the total compensation in a given week by the number of hours worked and then compared that rate to the applicable minimum wage. (*Id.*) Crandall included a summary of his findings in his report.

Crandall concluded that with the exception of three weeks all company drivers were paid at least minimum wage.

Crandall determined that two of the weeks in which there was a potential minimum wage violation was due to a truck rental deduction fee. (Doc. 162-22 at 10–11.) Those potential violations included underpayments of $0.72 for Dennis Hubbard and $68.65 for Frederick Neal. (*Id.* at 11.)[11] Crandall testified, however, that he believed that these violations were the result of human error in the true-up calculations completed by TransAm employees. (Doc. 191-8, Crandall Depo. at 59:17–60:15.)

Based on these two potential violations, Plaintiffs seek summary judgment for unlawful deductions and assert that "in workweeks when the truck rental fee is charged, drivers' hourly wage for every hour worked is less than $7.25." (Doc. 162 at 19.) Defendants oppose the motion on the basis that the evidence does not support this assertion. Defendants are correct. Plaintiffs have not shown that all drivers' wages fall below minimum wage in every week in which there is a truck rental deduction. At most, Plaintiffs have identified two potential violations of the FLSA. Plaintiffs, however, do not seek summary judgment on Hubbard's and Neal's behalf. Rather, they seek summary judgment on behalf of all Plaintiffs. The evidence does not support judgment in their favor. Therefore, Plaintiffs' motion for summary judgment on this claim is denied. Further, based on the record, Plaintiffs have only shown that there were three weeks in which named and opt-in Plaintiffs suffered a potential minimum wage violation under FLSA. As a result, those three named individuals may proceed on their individual FLSA claims involving failure to pay minimum

---

[11] The third potential violation is a week in which David Coleman's wages were $0.12 short of minimum wage. It is not clear the reason for this potential violation although Crandall's testimony indicates that he believes it was a mathematical error. (Doc. 191-8, Crandall Depo. at 59:17–60:15.)

wages after training.  Defendants are entitled to summary judgment on count six as to all remaining named Plaintiffs.

### iii.        Truth in Leasing Claims

Plaintiffs assert that all Defendants violated the Truth-in-Leasing ("TIL") regulations by improperly withholding escrow funds, failing to return funds, charging improper and/or excessive amounts for insurance and other items, improper non-disclosure of terms, and refusal to provide required information.  (Doc. 109 at 52–53.)  Plaintiffs bring this claim under 49 U.S.C. § 14704(a), which provides truckers with the right to bring a private cause of action against motor carriers for damages sustained as a result of a violation of the TIL regulations.  *Fox v. Transam Leasing, Inc*., 839 F.3d 1209, 1211 n.1 (10th Cir. 2016).  Congress regulates leases between truckers such as Plaintiffs who are parties to an ICA by requiring that leases be in writing.  *Id.* (citing 49 U.S.C. § 14102).  Congress tasked "the Department of Transportation ("DOT") with further regulating these leases; the DOT does so through its Federal Motor Carrier Safety Administration and its truth-in-leasing regulations, 49 C.F.R. Pt. 376."  *Fox*, 839 F.3d at 1211.[12]

"The truth-in-leasing regulations protect independent truckers from motor carriers' abusive leasing practices."  *Id.* at 1211.  The regulations were promulgated to promote full disclosure of the "elements, obligations, and benefits of leasing contracts . . . to eliminate or reduce opportunities for skimming and other illegal or inequitable practices by motor carriers; and . . . to promote the stability and economic welfare of the independent trucker segment of the motor carrier industry."  *Id.* (quoting *Owner–Operator Indep. Drivers Ass'n, Inc. v. Comerica Bank (In re Arctic Express Inc.)*, 636 F.3d 781, 795 (6th Cir. 2011); *see also Lease and Interchange of Vehicles*, 43

---

[12] "Congress initially regulated leases between independent truckers and motor carriers through the Interstate Commerce Commission ("ICC") until 1996, when Congress abolished that agency . . . ."  *Fox*, 839 F.3d at 1211, n.1 (citations and quotation omitted).  Originally, the ICC enforced the regulations against carriers.  After abolishing the ICC, Congress provided truckers with a private cause of action against carriers.  *Id.*

Fed. Reg. 29,812 (July 11, 1978)).  The requirements for the lease agreements are set forth in 49 C.F.R. § 376.12.

Both parties move for summary judgment on this claim.  With respect to Plaintiffs' motion, Plaintiffs seek summary judgment on their allegations pertaining to unlawful chargebacks for fuel, the fuel surcharge program, and physical damage insurance.  Defendants' motion is granted in part and Plaintiffs' motion is denied.

### a.  JHI and ONE

Defendants first assert that JHI and ONE should be granted summary judgment because they are not motor carriers under the regulation.  Under the regulation, a lease is a "contract or arrangement in which the owner grants the use of equipment, with or without driver, for a specified period to an authorized carrier for use in the regulated transportation of property, in exchange for compensation."  49 C.F.R. § 376.2(e).  TransAm does not contest that it is an authorized carrier. However, Defendants argue that JHI and ONE are not authorized carriers.  In response, Plaintiffs argue that it is well settled that entities that are affiliated with motor carriers may be subject to the TIL regulations.  (Doc. 185 at 30.)

Although neither the Tenth Circuit nor this district has addressed this issue, the federal courts facing this question have held that an affiliated entity may be required to comply with the regulations even though the entity is not a motor carrier under federal law.  *See, e.g., Owner–Operator Indep. Drivers Assoc., Inc. v. Arctic Express, Inc.*, 87 F. Supp. 2d 820, 828 (S.D. Ohio 2000); *Owner–Operator Indep. Drivers Assoc., Inc. v. United Van Lines, LLC*, Civ. No. 06–219, 2006 WL 1877081, at *5 (E.D. Mo. July 6, 2006); *Owner–Operator Indep. Drivers Assoc., Inc. v. Ledar Transp.*, Civ. No. 00–0258, 2004 WL 5376211, at *7 (W.D. Mo. Jan. 7, 2004); *Goodwin v. Am. Marine Express, Inc.*, No. 1:18-CV-01014, 2021 WL 848948, at *37 (N.D. Ohio Mar. 5,

2021).   The reasoning behind this application is to prevent registered carriers from "taking advantage of a potential loophole" where "a registered carrier could create a non-registered business entity and thereby avoid the regulations." *Arctic Express*, 87 F. Supp. 2d at 828–29.

The facts in this case are similar to the situation confronted in *Arctic Express*.   In that case, the plaintiffs had entered into a lease purchase agreement with non-motor carrier D&A and subsequently entered into another lease agreement with Arctic, a motor carrier.   In the subsequent lease agreement, the plaintiffs leased their trucks and services to Arctic.   *Arctic Express, Inc*., 87 F. Supp. 2d at 822.   The district court held that D&A was subject to the TIL regulations because both entities had common ownership and officers.   The court further relied on an opinion by the ICC that such affiliation was enough to trigger an obligation under the TIL regulations.

In this case, Defendants argue that the court should not expand the plain language of the regulation because there is no allegation that Defendants are exploiting a loophole as TransAm concedes it is an authorized carrier and subject to the regulations.   (Doc. 199 at 13–14) (citing *Owner-Operator Indep. Drivers Ass'n, Inc. v. United Van Lines, LLC*, No. 4:06-CV-219-JCH, 2006 WL 1877081, at *5 (E.D. Mo. July 6, 2006)).   The court agrees with Defendants.   Here, there is no danger that Defendants have exploited a loophole in which TransAm avoids complying with the TIL regulations.   To come to this conclusion, however, the court must first find that the terms of the ELA have been incorporated into the ICA such that TransAm is liable for any violation of the TIL regulations.   Based on the terms of the ICA, TransAm will not remit sums to a third party, such as ONE, unless the driver completes a request for TransAm to do so.   (Doc. 159-2 ¶ 19.)   The ICA further states that if the rental contract complies with applicable laws then TransAm will comply with the request and the terms of the rental contract will be incorporated.   (*Id.*)   The record shows that Plaintiffs Colvin-Williams, Roberts, Jarman, Otis, and Truitt all executed the form and

it was approved by TransAm.  (Docs. 151-8, 191-9, 191-10, 191-11, 191-12.)  Further, these ICAs state that the ELAs were attached to the contract.  Based on the uncontroverted evidence, the drivers' compensation was reduced to remit payments to ONE.  Therefore, the court finds that the ELAs were incorporated by reference to the ICAs and, as such, became part of the ICA.  *Tru Mobility, Inc. v. Briggs Auto Grp., Inc*., No. 521CV04071JARTJJ, 2023 WL 4930277, at *2 (D. Kan. Aug. 2, 2023) (applying Florida law in finding that terms of another agreement were incorporated into the contracts at issue).  TransAm can thus be held liable if any provision violates the TIL regulations.

With respect to ONE and JHI, the court sees no need to determine whether the regulations which apply to "motor carriers" extend to these Defendants because Plaintiffs have failed to show that Defendants are exploiting a loophole or avoiding the regulations.  If either agreement violates the TIL regulations and Plaintiffs suffered damages as a result, TransAm will be liable.  Therefore, the out-of-district decisions' reasoning for applying the regulations to affiliated entities is not applicable here.

### b.  Escrow Fund Accounts – performance escrow funds and maintenance funds

The ICA and ELA both have performance escrow funds and maintenance funds.  The parties do not dispute that these funds are escrow funds under the regulation.  Under 49 C.F.R § 376.12(k), if the terms of a lease require escrow funds, the lease must specify 1) the amount to be paid; 2) the "specific items to which the escrow fund can be applied;" 3) that an accounting shall be provided; 4) that the lessor may demand an accounting at any time; 5) that interest will be paid on the escrow fund; and 6) the conditions that the lessor must fulfill to have the escrow fund returned.

Defendants argue that summary judgment is appropriate on any alleged violation of the TIL regarding the escrow accounts because they complied with the regulation. Plaintiffs argue that TransAm violated the regulation by failing to specifically identify the items to which the escrow fund can be applied. Reviewing the ICA, with respect to the performance escrow fund, the lease states that the performance escrow fund may be applied to the amounts owed "pursuant to subparagraphs 1(b), 1(e), 1(i), 1(j) or 2(d) hereof, paragraphs 5 through 13 or paragraph 17 hereof, or any amounts which Carrier could deduct from the compensation otherwise payable to Contractor herein for Contractor's payment obligations in accordance with paragraph 15 hereof. Carrier shall not apply the performance escrow fund to any items not specified in this Agreement." (Doc. 159-2 ¶ 4.) Notably, however, those paragraphs cover a significant number of items. Further, paragraph 15 of the ICA includes a laundry list of items and also states "any and all other payment obligations or liabilities of Contractor specified in this Agreement." (*Id.* ¶ 15(l).) By including any conceivable obligation, TransAm failed to specify the items to which the fund is to be applied. Rather, it is merely a general fund for any obligation and fails to comply with § 376.12(k)(2). *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, No. CV-02-1059-PHX-PGR, 2007 WL 2808997, at *6–7 (D. Ariz. Sept. 27, 2007), *aff'd*, 632 F.3d 1111 (9th Cir. 2011); *Arctic Express, Inc.*, 159 F. Supp.2d at 1077–78 ("When the Defendants provided for everything to be covered by the maintenance fund, they, in reality, specified nothing.")

The performance escrow fund in the ELA suffers similar defects. The terms of the ELA fund merely state that it can be used for any and all amounts owed under the Agreement. (Doc. 159-19 ¶ 8.) This fails to comply with the requirement under § 376.12(k)(2) that the lease must specify items to which the escrow fund can be applied. The ELA's Maintenance/Tire Replacement Reserve suffers from a similar defect. Although it specifically identifies that the fund is to be used

for necessary maintenance and tire replacement, the ELA further provides that that this fund may be used to offset any payment deficiencies.  (*Id.* ¶¶ 7, 26.)  This is an improper offset under the regulation because it does not specifically identify the items to which the fund can be applied.  *Cf. Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, 339 F.3d 1001, 1010–11 (8th Cir. 2003) (finding that offset provision did not violate § 376.12(k)(2) because the lease specified the debts for which the lessor could offset).

Finally, Plaintiffs argue that the ICA's terms regarding the voluntary maintenance savings account violate the regulation because they fail to state the amount of the deduction, fail to accrue interest, and do not provide for an accounting.  (Doc. 185 at 36.)  Defendants do not respond to Plaintiffs' arguments concerning this escrow fund.  Based on the uncontroverted facts, the court finds that the lease terms regarding this fund do not comply with the regulation.

Therefore, Defendants' motion for summary judgment pertaining to the alleged violations of the TIL regulations pertaining to these funds is denied.

### c.  Failure to Provide Accounting

Under 49 C.F.R § 376.12(k), the motor carrier is to provide an accounting of the escrow funds.  On January 21, 2022, Plaintiffs' counsel sent a letter to Defendants seeking an accounting on behalf of the named Plaintiffs for the transactions involving the ICA's performance escrow fund and the ELA's maintenance/tire replacement reserve.  (Doc. 185-16.)  Defendants refused to provide this accounting on the basis that the named Plaintiffs were no longer independent contractors and, therefore, had no contractual right to the information.  (Doc. 185-17.)  Further, Defendants argue that all Plaintiffs were provided a final accounting at the time of termination and that those documents were produced in discovery.  (Doc. 199 at 15.)

Plaintiffs contend that this refusal to provide an accounting violates § 376.12(k)(4) which provides that a lessor may demand an accounting for transactions involving the fund at any time. Plaintiffs, however, do not provide any authority for the proposition that this provision means that a lessor can seek an accounting indefinitely.   Further, § 376.12(k)(6) requires Defendants to provide a final accounting within 45 days of the termination of the lease.  Plaintiffs do not assert that Defendants failed to comply with that provision and the uncontroverted evidence is that Defendants provided a final accounting for contractors.  (Docs. 159-12 at 2; 159 at ¶¶ 46, 76; 185 at 7, 9.)  Therefore, Plaintiffs have failed to show that Defendants violated the regulation and fail to show that they suffered any injury as a result.

Defendants' motion for summary judgment as to this aspect of Plaintiffs' TIL claim is granted.

### d.  Insurance

Under the regulation, the lease must clearly specify all items that may be initially paid for by the carrier, but ultimately are deducted from the lessor's compensation (referred to as a "charge-back").  49 C.F.R § 376.12(h).  Further, the lease must specify that the lessor is not required to purchase any products, equipment, or services as a condition of entering into the lease.  § 376.12(i). And, with respect to insurance, the lease must specify who is responsible for providing certain coverage and, if the carrier will make a charge-back to the lessor for any insurance, the lease shall specify the amount.  § 376.12(j).

Physical Damage Insurance.   Plaintiffs claim that these provisions were violated with respect to the physical damage insurance requirement.  Because the lease drivers were required to purchase physical damage insurance from ONE in order to enter the lease agreement with TransAm, Plaintiffs argue that TransAm violated the regulation.  In response, Defendants argue

that the ELA is not subject to the regulations and that the ICA specifically states that contractors do not need to purchase any services from TransAm  (Doc. 191 at 51.)  As discussed, however, the ELA was incorporated into the ICA; therefore, it must comply with the regulations.  It is uncontroverted that the ELA requires the lease drivers to purchase physical insurance and does not provide the drivers with an option to purchase such insurance from a third party.  By requiring Plaintiffs to purchase physical insurance from ONE and have the funds deducted from their settlements in order to lease with TransAm, Plaintiffs do not have an option of trying to obtain that insurance from a third party.  *See Fox v. Transam Leasing, Inc*., 839 F.3d 1209, 1214–17 (10th Cir. 2016) (discussing that the regulations do not allow a carrier to require truckers to purchase a service).  Therefore, summary judgment is denied as to this aspect of Plaintiffs' TIL claim. Plaintiffs' motion for summary judgment on this claim is denied as well because there are disputes of material fact as to Plaintiffs' injury due to the violation.

Plaintiffs further argue that § 376.12(j) was violated because TransAm failed to identify the amount of physical damage insurance.  The uncontroverted facts show that the ICA did not include an amount for physical damage insurance.  However, the ELA did disclose the charge for the physical liability insurance.  (Doc. 159-19 ¶ 19.)  Therefore, because the ELA was incorporated into the ICA, TransAm did not fail to disclose the charge for insurance in violation of § 376.12(j).

Relatedly, Plaintiffs claim that TransAm deducted $184 from some settlement statements instead of $181, which was the cost indicated on the ELA prior to 2020.  (Doc. 162 at 41.) Defendants dispute this assertion and object to Plaintiffs' mathematical computations on the basis that there are errors and they were done by Plaintiffs' attorney who is not expected to testify at trial. (Doc. 191 at 15–16.)  The court finds that there are disputes as to whether TransAm deducted

amounts in excess of the amount listed in the ELAs. Therefore, summary judgment on this claim is denied.

Plaintiffs also argue that the administrative fee incorporated into the physical insurance charge violates the chargeback regulation because the charge is for more than the cost of the insurance. In support of this position, Plaintiffs argue that the terms of the ICA state that Plaintiffs would only be charged the "cost" of the physical damage insurance because the terms state that lease drivers would be "charge[d] such costs" and "charged for such insurance coverage." (Doc. 162 at 12, 40) (citing ICA ¶ 9(c)). The provision of the ICA cited by Plaintiffs, however, goes on to state that the "specific amount to be charged for such insurance coverage will be specified in an exhibit or addendum attached hereto." (Doc. 159-2 ¶ 9(c)). As discussed, the ELA included a provision stating a total amount for the physical damage insurance and the administrative cost. (Doc. 159-19 ¶ 19.) Therefore, any assertion that Defendants violated the regulations by failing to charge only the cost of the policy is not supported by the lease. The plain language of the regulation does not preclude Defendants from profiting or charging an administrative charge. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Swift Transp. Co. (AZ)*, No. CV-02-1059-PHX-PGR, 2007 WL 2808997, at *3 (D. Ariz. Sept. 27, 2007), *aff'd*, 632 F.3d 1111 (9th Cir. 2011) (discussing that motor carriers must disclose the existence of a mark-up but the regulation does not require them to disclose the actual amount of the mark-up). Therefore, the court grants Defendants' motion for summary judgment with respect to Plaintiffs' assertion that the inclusion of the administrative fee in the insurance charge violates the regulation.

Other insurance products. Defendants move for summary judgment on Plaintiffs' claims regarding charges related to other insurance products that were purchased by lease drivers. Plaintiffs argue that TransAm's deductions for these products violate the charge-back requirement

and the requirement that a motor carrier perform under the lease agreement because they were charged more than the amount set forth in the ICA. In support of this argument, Plaintiffs included a table of charges detailing the amounts from the ICA and the actual amounts deducted. (Doc. 185 at 18.) In response, Defendants state that this fact is controverted and argue that the "table ignores the specific circumstances relating to the drivers listed and there are many reasons for variations in insurance costs meaning the reasons behind the differences will need to be examined driver-by-driver." (Doc. 199 at 7.) Defendants' cited evidence in support of their position, however, only genuinely attempts to controvert one instance of an overcharge. (Doc. 199-5.)

Viewing the evidence in a light most favorable to Plaintiffs, the court finds that Plaintiffs have introduced evidence to create a genuine dispute of material fact as to whether TransAm violated the regulation when it charged back amounts that were more than the amounts set forth in the lease drivers' ICAs.

### e.  Alleged Chargebacks and Deductions

Both parties move for summary judgment with respect to Plaintiffs' TIL claim regarding the fuel surcharge and discounts in the ICA. With respect to the fuel surcharge, Plaintiffs argue that the program is an unlawful charge-back that TransAm failed to disclose in the ICA. In response, Defendants argue that the fuel surcharge exhibit attached to the ICAs and updated by weekly emails is sufficient to comply with the regulation. The regulation states that the "amount to be paid by the authorized carrier for equipment and driver's services shall be clearly stated on the face of the lease or in an addendum which is attached to the lease." 49 C.F.R. § 376.12(d). The regulation further states that any items that are initially paid but then deducted from compensation shall be clearly specified. *Id.* § 376.12(h).

After review, the terms of the ICA fail to specifically state that the contractor is required to pay TransAm by way of deduction from compensation for the fuel surcharge in weeks in which the price of fuel falls below a certain amount.  The terms of the ICA state that the fuel surcharge is an amount paid to the contractor, not an amount paid to TransAm by the contractor.  The only indication that the fuel surcharge is negative is the presence of the parenthetical on the exhibit. The terms, however, do not specify that the contractor will pay those amounts.  Rather, the terms clearly state that TransAm will pay the fuel surcharge to the contractors.  (Doc. 159-2 ¶ 8.)  That provision then goes on to explain how the payment is calculated and also states that TransAm may advance these payments to the contractors.  There are no terms that state that the contractor will have to pay TransAm when the fuel price drops below a certain amount.  Therefore, the court finds that the fuel surcharge deduction violates the TIL.[13]  However, the court declines to grant summary judgment on the basis that there is a dispute as to the actual damages.[14]

Plaintiffs further assert that the terms in the ICA regarding the provision of an EFS Card and Fuel Discounts at the pump violate the TIL regulation because it is an illegal charge-back. The ICA states that contractors are responsible for the cost of fuel.  However, contractors may use the EFS card to purchase fuel through the carrier's fuel network.  According to the ICA, the contractor will then receive the benefit of any at-pump discount.  (Doc. 159-2 ¶ 1(f).)  Plaintiffs' settlement statements reflect a deduction for the fuel for the price that was charged at the pump. Plaintiffs argue that the ICA is contradictory because it also states that the "contractor will not receive the benefit of any other discounts or rebates Carrier receives on fuel purchases made

---

[13] There is also evidence that some of the named Plaintiffs did not have an exhibit reflecting amounts of the fuel surcharge in parentheses.  (Docs. 164-9; 162 at 11; 191 at 13.)  Defendants assert that this incorrect exhibit was inadvertently provided to drivers for a short time and it was corrected on February 25, 2020.  (Doc. 191 at 12.)  With respect to these Plaintiffs, it is also clear that the TIL regulation was violated.

[14] The damages calculations are based on Plaintiffs' counsel's review of the settlement statements.  (Doc. 163 at 7.) Defendants object to the calculations on the basis that there are mathematical errors and that the affidavit is not admissible at trial.  (Doc. 191 at 13; 170.)  The court finds that there are disputes as to the damages on this issue.

through Carrier's fuel network using the EFS card." *Id.*  Plaintiffs argue that this contradictory language violates the regulation because TransAm has not fully disclosed what Defendants deduct and the amount of the discount.  The undisputed evidence is that Plaintiffs' settlement statements are charged for the fuel purchased at the pump if the driver uses the EFS card.  Moreover, Defendants have introduced evidence that they fully pass 100 percent of any fuel discounts or incentives to the lease drivers.  (Aff. of Murray Droescher, Doc. 159-12 at ¶ 11.)  In response, Plaintiffs assert that this statement may not be accurate and they need additional discovery on this issue, citing to Federal Rule of Civil Procedure 56(d).  (Doc. 185 at 40.)  Plaintiffs would like to depose Mr. Droescher regarding this issue and have attached an affidavit from counsel regarding the same.  (Doc. 188.)  In response, Defendants assert that more than 30 depositions have been conducted, including three of Mr. Droescher, and that Plaintiffs propounded over 110 document requests and subpoenaed fuel payment records from third parties.  (Doc. 199 at 16.)

"In this circuit, a party seeking to defer a ruling on summary judgment under [Rule 56(d)] must provide an affidavit explaining why facts precluding summary judgment cannot be presented." *Valley Forge Ins. Co. v. Health Care Mgmt. Partners, Ltd.*, 616 F.3d 1086, 1096 (10th Cir. 2010) (quotation and alteration omitted). The affidavit should address: "(1) the probable facts not available, (2) why those facts cannot be presented currently, (3) what steps have been taken to obtain these facts, and (4) how additional time will enable the party to obtain those facts and rebut the motion for summary judgment." *Id.* (quotation omitted).

Plaintiffs have failed to make the required showing under Rule 56(d).  Although the court recognizes that damages' discovery has been separated from other fact discovery, Plaintiffs have failed to explain why the facts at issue here are not available in light of the significant discovery to date and Mr. Droescher's repeated depositions.  Further, they have not identified what steps

they have taken regarding discovery as to the fuel discounts which is significant in light of Defendants' representations.

Plaintiffs have failed to establish that there is an issue of genuine material fact as to whether Defendants have received rebates or incentives that they have not passed on to the lease drivers. Further, in light of the uncontroverted evidence that Defendants pass on all discounts to the drivers, Plaintiffs cannot show that they suffered any injury. Defendants' motion for summary judgment pertaining to any alleged violation of the TIL regulations due to fuel discounts is granted.

### f.   ELA's Lease Completion Bonus

Defendants move for summary judgment on Plaintiffs' allegations that the provision pertaining to the lease completion bonus is an unlawful early termination penalty. Defendants assert that this provision clearly identifies this as a bonus to be earned after completing the lease and is not an escrow account. (Doc. 159 at 33.) Plaintiffs fail to respond to Defendants' position in their response brief.

Therefore, summary judgment is granted in favor of Defendants regarding any allegations that the lease completion bonus provision violates the TIL regulations.

### iv.   Bradley's Claims

Defendants move for summary judgment on Reginald Bradley's claims on the basis that they are barred by the applicable statute of limitations because his last date of employment, January 16, 2017, was more than four years before this action was filed on February 10, 2021. In response, Plaintiffs concede that Bradley's KCPA claims are time barred. Plaintiffs fail to respond to Defendants' motion with respect to Bradley's FLSA claim. As claims under the FLSA must be brought within two or, at the most, three years for willful violations, Plaintiff's FLSA claim is also barred. 29 U.S.C. § 255(a).

With respect to the TIL claim, although Plaintiffs have asserted that Bradley raised such a claim, the complaint's class definition would not include Bradley because the allegations only encompass lease drivers who executed a lease within four years of the filing of the complaint. (Doc. 19 ¶ 265.)  Further, the individual allegations on that count do not include him but only specify the named Plaintiffs who suffered the same damages as Roberts, Colvin-Williams, and McRoberts.  (*Id.* at 52–53.)  Therefore, Defendants' motion could be granted on this basis. Nevertheless, Plaintiffs have failed to submit evidence that any violations of the TIL regulations with respect to Bradley occurred within four years of February 10, 2021.  Plaintiffs argue that Bradley received a final accounting on February 22, 2017 which showed that he had a balance owed of more than $8,000.   Plaintiffs, however, admit that Bradley's final accounting "incorporates negative settlement balances dating back to January 6, 2017" and they make no effort to identify what violation specifically occurred on February 22. (Doc. 185 at 41.)  Therefore, any alleged violations of the regulation pertaining to an illegal charge-back on Bradley's settlement statements were undertaken before they were again stated on the February 22 final accounting. Plaintiffs have not set forth any evidence showing that there was a violation of the TIL regulations after February 10, 2017 with respect to Bradley.  Therefore, to the extent Bradley seeks to join the allegations pertaining to a TIL violation, such claim is barred by the statute of limitations.

With respect to Bradley's claims under the Kansas Wage Payment Act ("KWPA"), Defendants argue that such claims are barred after three years and Plaintiffs contend that the claims are subject to a five-year statute of limitations.  In this case, the KWPA claim is based on unlawful deductions from compensation that are detailed in the ICAs.  (Doc. 109 ¶¶ 137–44.)  Because Plaintiffs' claim is based on a written agreement, the five-year statute of limitation in K.S.A. 60-511 applies.  *See Sibley v. Sprint Nextel Corp.*, No. 08-CV-2063-KHV, 2016 WL 11185552, at

*17 (D. Kan. Oct. 15, 2016), *report and recommendation adopted*, No. CV 08-2063-KHV, 2017 WL 2471304 (D. Kan. June 8, 2017); *Knight v. Mill-Tel, Inc*., No. 11-1143-EFM, 2013 WL 3895341 at *4 (D. Kan. July 29, 2013) (applying a five-year statute of limitations to class-action KWPA claims arising under written contract).

In sum, Defendants' motion for summary judgment is denied as to Bradley's KWPA claim but granted as to Bradley's remaining claims.

**B. Conditional Certification**

Under the FLSA, an employee may bring claims against his or her employer on behalf of employees who are "similarly situated." 29 U.S.C. § 216(b). Unlike a class action which is certified under Federal Rule of Civil Procedure 23, "[n]o employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." § 216(b). This means that putative class members must "opt-in" to the collective action. The court may certify an FLSA collective action when the aggrieved employees are similarly situated. *Thiessen v. Gen. Elec. Capital Corp*., 267 F.3d 1095, 1105 (10th Cir. 2001). The Tenth Circuit has set forth a two-step approach for determining whether plaintiffs in a proposed opt-in collective action are "similarly situated" for purposes of § 216(b). *Id*. The court first determines "whether a collective action should be certified for purposes of sending notice of the action to potential class members." *In re Bank of Am. Wage & Hour Emp't Litig.*, 286 F.R.D. 572, 576 (D. Kan. 2012). At this stage, nothing more is required than "substantial allegations that the putative class members were together the victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102. This standard is "lenient and typically results in certification." *Koehler v. Freightquote.com, Inc*., 93 F. Supp. 3d 1257, 1261–62 (D. Kan. 2015) (quoting *In re Bank of Am. Wage & Hour Emp't Litig*., 286 F.R.D. at 576.)

After discovery is completed, Defendants may file a motion to decertify and the court then utilizes a stricter standard in evaluating whether the employees are similarly situated. *Thiessen*, 267 F.3d at 1102–03. This entails reviewing "the disparate factual and employment settings of the individual plaintiffs, the various defenses available to the defendant which appear to be individual to each plaintiff, and fairness and procedural considerations." *Koehler*, 93 F. Supp.3d at 1261. The court declines Defendants' invitation for this court to apply a higher standard to Plaintiffs' motion at this stage of the proceedings.

### i.    Orientation Collective

With respect to count I, which alleges that Defendants failed to pay minimum wages for hours worked during orientation, Plaintiffs seek to conditionally certify and authorize notice to "all individuals who attended TransAm's orientation and training program for company drivers in Rockwall, Texas, or Tampa, Florida (the 'Orientation Collective')." (Doc. 142 at 6.) Plaintiffs contend that they are similarly situated in that they failed to receive minimum wages during their compensable time spent in orientation, they all attended training in either Texas or Florida, they were all paid a flat rate to attend orientation, and they were trained by Defendants utilizing a standardized orientation training. In response to Plaintiffs' motion for certification of this claim, Defendants assert that the evidence supports a finding that drivers were paid minimum wage during orientation. (Doc. 149 at 6–7.) As discussed, the court finds that there are disputes of material fact as to whether the drivers were paid minimum wage during orientation. Based on the allegations in the third amended complaint and the uncontroverted evidence, the court further finds that the potential class members are similarly situated. They all attended a standardized training, were all paid with similar policies, and all had similar job duties. *Blair v. Transam Trucking, Inc.*, No. 09-2443-EFM-KGG, 2015 WL 5006076, at *9 (D. Kan. Aug. 20, 2015) ("*Blair I*"). The court

finds that the allegations support a finding that they were the "victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102.  Essentially, TransAm failed to pay the drivers minimum wages when attending orientation.

Therefore, Plaintiffs' motion to conditionally certify the Orientation Collective is granted.

**ii.      Lease Driver Collective**

Next, Plaintiffs seek to certify the Lease Driver Collective based on the allegations set forth in Count V.  In that count, Plaintiffs allege that the lease drivers were misclassified as independent contractors and that they should have been classified as employees.  Plaintiffs seek to conditionally certify a collective that includes "all individuals who have personally driven for TransAm subject to an independent contractor agreement with TransAm that they themselves signed while leasing a truck from ONE Leasing" within the last three years.  (Doc. 142 at 6.)

Plaintiffs argue that TransAm and JHI have violated the FLSA by misclassifying lease drivers which resulted in these Defendants failing to pay drivers minimum wages for all hours worked.  Plaintiffs contend that the lease drivers are similarly situated because all lease drivers are classified as independent contractors, required to sign an ICA, perform the same job duties, paid in the same manner, supervised by the same team of managers, and subject to the same policies. (Docs. 142 at 13; 144-4.)   Plaintiffs allege that they are employees of TransAm based on Defendants operational and financial control of the lease drivers.  (Doc. 109 ¶¶ 130–31.)  Plaintiffs further allege that TransAm failed to pay them minimum wages for all hours worked and that deductions were taken from their pay which resulted in their wages falling below minimum wage. In response, Defendants argue that the court should deny Plaintiffs' motion because the facts demonstrate a case-by-case factual inquiry to resolve issues of both liability and damages.

Defendants assert that the evidence relating to whether Plaintiffs are employees instead of independent contractors is vastly different as to each driver.

Defendants' arguments are more suited to the decertification stage. In order to determine whether an employer has misclassified an individual as an independent contractor, the court is to consider six factors commonly referred to as the "economic realities" test. *Blair v. TransAm Trucking, Inc*., 309 F. Supp. 3d 977, 1002 (D. Kan. 2018) ("*Blair II*") (citing *Barlow v. C.R. England, Inc*., 703 F.3d 497, 506 (10th Cir. 2012)). Defendants spend much time arguing that the facts show that there will be individual inquiries into at least two of these factors. (Doc. 149 at 9–14.) However, as noted by Plaintiffs, these factors involve analyzing the "disparate factual and employment settings of the individual plaintiffs" which is reserved for the second, decertification step. *See Thiessen*, 267 F.3d at 1102–03. In support of their position, Defendants cite to *Blair II*, which involved a motion to decertify the class. A motion to decertify includes a higher standard which Judge Melgren undertook by reviewing significant facts involving the named and opt-in plaintiffs and reviewed those facts in connection with the economic realities test. *Blair II*, 309 F. Supp. 3d at 1001–11. While the court will consider these factors on a motion to decertify, the court declines to review those factors at the notice stage. *See Hose v. Henry Indus., Inc*., 49 F. Supp. 3d 906, 914, 917 (D. Kan. 2014), *order clarified sub nom. Hose v. Henry Indus*., No. 13-2490-JTM, 2014 WL 5510927 (D. Kan. Oct. 31, 2014) (declining to address the merits of the claim at the conditional certification stage which included arguments raised by the defendant as to the economic realities test); *see also Judd v. KeyPoint Gov't Sols., Inc*., No. 18-CV-00327-RM-STV, 2018 WL 4383037, at *4 (D. Colo. July 30, 2018), *report and recommendation adopted*, No. 18-CV-00327-RM-STV, 2018 WL 7142193 (D. Colo. Dec. 4, 2018) (same) (citing cases); *see Brown v. Money Tree Mortg., Inc*., 222 F.R.D. 676, 682 (D. Kan. 2004) ("As explained above, however,

the court will examine the individual plaintiffs' disparate factual and employment settings, as well as the various defenses available to the defendant which appear to be individual to each plaintiff, during the 'second stage' analysis after the close of discovery.")

Defendants fail to cite to any persuasive Tenth Circuit authority in support of their position that the court should engage in a fact-intensive review of the merits of Plaintiffs' claims with respect to misclassification at this stage and the court declines to do so.

Defendants further argue that the damages inquiry will require an individualized review of every settlement statement.  (Doc. 149 at 14.)  Individual questions regarding damages are also not appropriate for consideration at the notice stage.  *See Brown*, 222 F.R.D. at 682 (declining to address individual damages questions at the notice stage).

The court finds that the allegations support a finding that the lease drivers were the "victims of a single decision, policy, or plan." *Thiessen*, 267 F.3d at 1102.  Plaintiffs here allege that TransAm engaged in a pattern or practice of not paying minimum wages.  The Court finds that the class members are similarly situated and the allegations are sufficient to grant conditional certification.

### iii.     Company Driver Collective

Finally, as to Count VI, Plaintiffs move to conditionally certify a class of company drivers on the basis that TransAm failed to pay minimum wages after orientation.  Plaintiffs seek to certify a class that includes all individuals who have worked on an employee basis as company drivers for TransAm in the last three years.  (Doc. 142 at 6–7.)  In support of their motion, Plaintiffs argue that TransAm failed to pay their employee drivers for all on-duty time and did not compensate drivers for sleeper berth time.  (*Id*. at 16.)

The court has determined that Defendants are entitled to summary judgment on Plaintiffs' claim that the time in the sleeper berth was compensable time under the FLSA. Therefore, Plaintiffs' motion to conditionally certify the class is denied on that basis.

The court further notes that it denied the motion for summary judgment pertaining to truck rental deductions. Plaintiffs, however, do not appear to seek conditional certification with respect to an unlawful policy regarding truck rental deduction. Further, based on the evidence discussed herein, such a claim would not be suitable for a collective action as Plaintiffs have not sufficiently alleged that they were similarly subject to an unlawful policy regarding truck rental deductions. Rather, the evidence was that there were only two instances in which a truck rental deduction resulted in a potential FLSA violation.

Plaintiffs' motion to conditionally certify the Company Driver Collective is denied.

**iv.     Conclusion**

Plaintiffs' motion to conditionally certify the Orientation and Lease Driver Collectives is granted. Plaintiffs' motion to conditionally certify the Company Driver Collective is denied. The two collective classes are conditionally certified for the time period beginning three years prior to the date of this order.

The parties must also confer over the form and content of the notice that will be disseminated to the collective action members. Within 30 days of this order, the parties are to submit a proposed form of notice for the court's approval. Defendants must provide Plaintiffs with the name, current or last known addresses, email addresses, and telephone numbers of all individuals who meet the definition of the two collectives within 30 days of the court's approval of the form of notice.

**C.  Rule 23 Class Certification**

The requirements to maintain a class action are set forth in Federal Rule of Civil Procedure 23 and are more stringent than the requirements for the notice stage of a collective action.  As the party seeking certification, Plaintiffs must show that the proposed class satisfies the requirements in Rule 23(a) and one of the alternatives contained in Rule 23(b).  *See* Fed. R. Civ. P. 23(a)–(b).  In their motion, Plaintiffs seek to certify three classes and two subclasses pursuant to Rule 23(b)(3).  If Plaintiffs satisfy the requirements of Rule 23(a), a class action may proceed under Rule 23(b)(3) if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Rule 23(c)(4) additionally provides that, "when appropriate, an action may be brought or maintained as a class action with respect to particular issues."  The Tenth Circuit has recently held "that certification of an issue class under Rule 23(c)(4) is appropriate if the issue class itself satisfies the requirements of Rules 23(a) and 23(b)."  *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161, 1188 (10th Cir. 2023).  Although Plaintiffs cite to Rule 23(c)(4), they do not seek to certify an issue class under that rule.

In seeking class certification, Plaintiffs "must affirmatively demonstrate [their] compliance with the Rule."  *Black*, 69 F.4th at 1173 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  "That is, the party seeking class certification must prove the requirements 'are *in fact*' satisfied."  *Id.* at 1174 (quoting *Dukes*, 564 U.S. at 350) (emphasis in original).  The court must undertake a rigorous analysis to assure that the requirements are satisfied.  *Id.*  The court may consider merits questions to the extent they are "relevant to determining whether the Rule 23 prerequisites for class certification are satisfied."  *Id.* (quoting *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging

merits inquiries at the certification stage."). The district court "must generally accept the substantive, non-conclusory allegations of the complaint as true." *Id.* (quoting *Vallario v. Vandehey*, 554 F.3d 1259, 1265 (10th Cir. 2009)). The court cannot relax or shift the burden of proof when evaluating the requirements. *Id.*

### i.   Florida Minimum Wage Class

Plaintiffs move to certify a class for their claim of failure to pay minimum wages during orientation in violation of Section 448.110 of the Florida Statutes. The proposed class includes all individuals who attended TransAm's orientation program in Tampa, Florida at any time since February 10, 2016.[15]  In response, Defendants argue that the claim should not be certified because the Florida Plaintiffs were paid minimum wages during orientation.  The court has denied Defendants' motion for summary judgment on the overtime claim, however.  Defendants do not present any additional opposition to the certification of this claim.

Under Rule 23(a)(1), the court first considers whether "the class is so numerous that joinder of all members is impracticable."  Here, the evidence is that there were almost 3,000 drivers who attended orientation in Florida from February 2018 to January 2022.  (Docs. 144-4 ¶ 35; 144-26.) Based on this evidence, the court finds that Plaintiffs have satisfied the requirement of Rule 23(a)(1). *See Eatinger v. BP Am. Prod. Co.*, 271 F.R.D. 253, 258 (D. Kan. 2010) (finding that class of at least 2,000 members satisfied numerosity requirement).

Next, under Rule 23(a)(2), Plaintiffs must establish that there are questions of law or fact common to the class.  This inquiry essentially looks at whether the members of the putative class "possess the same interest and suffer the same injury." *Eatinger,* 271 F.R.D. at 259.  Plaintiffs

---

[15] Although Defendants do not argue to the contrary, Plaintiffs may maintain both a FLSA collective action and a state-law Rule 23(b)(3) class action in the same proceeding. *See Calderone v. Scott*, 838 F.3d 1101, 1107 (11th Cir. 2016).

have identified several common questions of law and fact including whether TransAm and JHI are joint employers; whether TransAm failed to record all time in orientation as compensable; whether the flat amount paid for orientation met or exceeded the Florida minimum wage.  Based on the evidence, TransAm conducted the same orientation with a specific schedule and paid all drivers the same flat wage for that training.  Further, there is evidence that TransAm did not accurately record the time spent in orientation and there is also evidence that the orientation adheres to a schedule which results in orientation lasting 7 to 7 ½ hours each day.  Given that the drivers attended the same training and were paid the same flat rate, the court finds that there are common questions as to the entire class regarding the payment of minimum wages to drivers during orientation.

Next, Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class and the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)–(4).  To satisfy the adequacy requirement, the representative plaintiffs must be a member of the class, and "must show that (1) his interests do not conflict with those of the class members and (2) that he will be able to prosecute the action vigorously through qualified counsel." *Eatinger*, 271 F.R.D. at 260. The named representatives of the Florida class are David Coleman and Terrence Colvin-Williams.  They both attended TransAm's orientation in Florida and have asserted claims for failure to pay minimum wages.  They were both paid flat rates for attending that training and both assert that they were not compensated for all hours that they worked during orientation.  Defendants argue that Colvin-Williams does not have a viable claim because he was paid minimum wages for orientation after TransAm did a true-up payment to account for the failure to pay minimum wages.  (Doc. 150 at 36.)  While Defendants did issue a subsequent payment to Colvin-Williams, that payment was

issued more than one year after the orientation and there remains a dispute as to whether the hours were adequately recorded during orientation.  (Doc. 144-30 at 4–5.)  Therefore, the court finds that both Coleman and Colvin-Williams have similar claims that are typical to the class.  There is no evidence that Colvin-Williams or Coleman have any fundamental conflicts with the proposed class members and Defendants do not offer any further objection to these named Plaintiffs' ability to represent the class.  Therefore, the court has no reason to doubt that Colvin-Williams and Coleman will adequately and fairly represent and protect the interests of all members of the putative class.

Next, the court must determine whether Plaintiffs have established that common issues predominate over individual issues and that a class action is a superior method for adjudicating the issues.  Fed. R. Civ. P. 23(b)(3).  The court will look to the predominance question first.

Rule 23(b)(3)'s predominance inquiry looks to "whether the common, aggregation-enabling, issues in the case are more prevalent or important than the noncommon, aggregation-defeating, individual issues."  *Black*, 69 F.4th at 1175 (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).  The court should "characterize the issues in the case as common or not, and then weigh which issues predominate."  *Id.* (citation omitted).

Here, Plaintiff asserts that the common issues include whether TransAm accurately recorded compensable time; whether Plaintiffs were paid minimum wages for the time spent in orientation; and whether TransAm and JHI are joint employers.  Plaintiffs allege that these issues are all common to the proposed class and that the resolution of these issues will resolve each potential class member's underlying cause of action under Florida law.  Plaintiffs argue that evaluating their claim will turn on common evidence of the orientation program, the compensation policy, and the amount of time drivers spend in orientation.

52

The court finds that Plaintiffs have not submitted any reliable, common proof that would show a violation for each member of the class.  For example, although Plaintiffs have introduced evidence that TransAm may have failed to accurately record hours for the named Plaintiffs using the Garmin devices, Plaintiffs have done so by using deposition testimony of a typical orientation day as the standard for compensable hours.  Plaintiffs have not introduced evidence that there is a systemic problem of failing to pay minimum wages during orientation.  Moreover, it is uncontroverted that TransAm does a weekly true-up to make sure that all of its drivers are paid minimum wages.  In any event, even if the court assumes that the proposed class's compensable hours were not properly captured, Plaintiffs assert without any authority that the court may use the 7.5 hours per day figure and apply it across the board to the entire class at trial.  (Doc. 155 at 24–25.)  Plaintiffs do not cite any authority for such a proposition.

In support of their argument that there are common issues and that individual claims do not predominate, Plaintiffs cite to *Griffith v. Landry's*, 2017 WL 11002193 (M.D. Fla. Jan. 30, 2017). (Doc. 144 at 26–27.)  In that case, the defendant charged a fee to employees to participate in an employee discount program.  The fee allegedly caused the plaintiffs' wages to fall beneath minimum wages.  In finding that the plaintiffs had established commonality and predominance, the court held that although there may be individualized inquiries to determine the pay periods in which the violations occurred that this would not defeat certification because the questions could "be answered by extracting information from payroll documents and performing calculations according to a mechanical formula."  *Id*., at *7.  Further, the parties had experts to submit their calculations done on a class wide basis.  Here, Plaintiffs contend that the issues common to this class can also be answered by extracting information from the payroll records and performing

calculations. This, however, again assumes that there will be class wide proof as to whether TransAm failed to properly capture the drivers' compensable time.

Based on Defendants' position on summary judgment, Defendants will assert that the devices accurately captured the time in orientation. Further, they will put forth evidence that they also performed a true up to make sure drivers were paid minimum wages. Moreover, they have an expert who has calculated that they paid minimum wages to all drivers attending orientation with the exception of a few who had a truck rental fee deduction. As a result, Plaintiffs have not put forth evidence that the issue of whether TransAm has accurately captured the class's compensable time can be answered with respect to the entire class. Rather, the court will have to determine for each class member whether the time was accurately captured and compensated. This will result in a number of mini trials regarding each class member's orientation schedule and hours paid. Further, although Plaintiffs' challenge Defendants' experts' calculations based on TransAm's time records, Plaintiffs have not set forth sufficient evidence that the alleged policy of not capturing hours worked is a class wide problem.

In sum, Plaintiffs have not shown that any common issue with respect to liability would predominate over individual issues. Although Plaintiffs have certainly raised common questions, the resolution of those questions "must be of such a nature that it is capable of *classwide resolution*—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wallace B. Roderick Revocable Living Tr. v. XTO Energy, Inc.*, 725 F.3d 1213, 1218 (10th Cir. 2013) (quoting *Wal–Mart*, 131 S. Ct. at 2551). Plaintiffs have not met that burden here with respect to the claimed common questions. Rather, significant individualized assessments would be required to determine whether in fact Defendants are liable to each putative class member. Further, there will also be significant

dispute as to the damages, if any, as to each class member.  The class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700–701 (1979)).  To come within this exception, Plaintiffs must "affirmatively demonstrate" their compliance with Rule 23.  *Id.*  Plaintiffs have not done so.

Therefore, Plaintiffs' motion to certify the Florida class is denied.

### ii.  KCPA Class

Plaintiffs seek to certify two subclasses with respect to their KCPA claim.  However, the court granted Defendants' motion for summary judgment on this claim.  Therefore, the motion to certify the subclasses for this claim is denied as moot.

### iii.  KWPA Class

According to the amended complaint, Plaintiffs assert that Defendants have misclassified lease drivers as independent contractors when they are actually employees and Defendants have made unlawful deductions from their wages in violation of the KWPA.  (Doc. 109 ¶ 5.)  Plaintiffs assert that these deductions are unlawful under the KWPA because they do not accrue to the benefit of the employee and because, in some weeks, they result in their wages being reduced below minimum wage.  With respect to the unlawful deductions, Plaintiffs allege that lease drivers are subject to deductions for fuel, fuel taxes, highway use taxes, maintenance and repairs of the truck, bobtail and deadhead insurance premiums, "occupational accident insurance premiums, a weekly fee for use of TransAm's Pass Plus - Scale bypass transponder services, and a weekly fee for fuel optimization services."  (Doc. 109 ¶¶ 137–38.)  Plaintiffs further allege that there are other expenses that they are required to pay that are deducted from their wages.  Some of these deductions also include pay advances.  (Docs. 144-4; 144-30.)

Plaintiffs seek to certify a class with respect to their claim under the KWPA.  The putative class includes "all individuals who have worked for TransAm pursuant to an independent contractor agreement while subject to an equipment lease agreement with ONE Leasing at any time since February 10, 2018." (Doc. 144 at 8.)  Plaintiffs have put forth evidence that this putative class could include more than 2,000 lease drivers.  (Docs. 144 at 11; 144-26.)

Defendants object to Plaintiffs' motion to certify the class on the basis that the proposed class lacks commonality and individual issues predominate over any common questions.  Viewing the evidence and the allegations in the amended complaint, the court agrees that Plaintiffs have not established predominance and directly moves to that issue.

The plain language of K.S.A. § 44-314(a) states: "[e]very employer shall pay all wages due to the employees of the employer at least once during each calendar month, on regular paydays designated in advance by the employer."  The KWPA defines "wages," as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission or other basis less authorized withholding and deductions."  K.S.A. § 44-313(c).  The KWPA provides that "no employer may withhold, deduct or divert any portion of an employee's wages unless: (1) The employer is required or empowered to do so by state or federal law . . . [or] (3) the employer has a signed authorization by the employee for deductions for a lawful purpose accruing to the benefit of the employee."  § K.S.A. 44-319.  The regulations further provide which deductions are authorized and which deductions are not authorized.  K.A.R. § 49-20-1.

Under the plain language of the KWPA, it is only applicable to employees.  Therefore, any claim under the KWPA for unlawful deductions is premised on Plaintiffs being misclassified as independent contractors when they are in fact employees who are entitled to the protections under the KWPA. *Blair*, 309 F. Supp. 3d at 1013.  To establish a claim under the KWPA, Plaintiffs must

56

prove that they were not paid wages that were due under Kansas law.  Plaintiffs contend that TransAm's deduction policies violate the KWPA in that they were unlawful.  (Doc. 144 at 40.) Plaintiffs argue that this inquiry is not one that requires individual analysis and that "the deductions either comply with the KWPA or they do not."  (*Id.*)  In response, Defendants argue that the individual issues will predominate over common issues because the drivers incurred "deductions for varying types of insurance coverage, tax issues, various lease terms, equipment add-ons, programs, and even garnishments for personal obligations."  (Doc. 150 at 32.)

In support of their position, Plaintiffs argue that TransAm's deduction polices are all unlawful under the KWPA.  Plaintiffs do not attempt to narrow the policy by identifying what deductions are unlawful even though it is undisputed that the lease drivers executed authorizations as to certain deductions.[16]  Therefore, the court is faced with a potential class of thousands in which numerous deductions were taken from their wages.  Plaintiffs have not set forth facts detailing whether all putative class members were subjected to all types of deductions identified in the amended complaint or whether some Plaintiffs were subjected to some deductions and not others. As such, it is very likely that there will be issues that will not be common to the class.

In order to overcome this hurdle, Plaintiffs attempt to argue that all the signed authorizations are invalid because the lease drivers agreed to them in a contract in which they were identified as an independent contractor but they were in fact employees.  (Doc. 144 at 41) (citing *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 561 (D. Or. 2009)).  As a result, all deductions would be

---

[16] In their reply brief, Plaintiffs state that they are not challenging every deduction from drivers' pay.  (Doc. 172 at 14.)  Plaintiffs argue that they are challenging certain categories of deductions.  Plaintiffs then cite to their amended complaint.  As discussed herein, the amended complaint alleges several different types of deductions taken from Plaintiffs' wages.  Further, it also generally asserts that unlawful deductions were taken and upon termination other deductions were taken from their final paychecks.  (Doc. 109 ¶ 140.)  Plaintiffs' facts in support of their motion for class certification also identify deductions such as "express pay" and an "advance," which suggests that they are challenging every deduction including deductions made for personal reasons.  (Doc. 144-4 ¶ 41.)  Plaintiffs' motion for class certification does not limit the deductions at issue for the class contrary to Plaintiffs' argument in their reply.

invalid under Kansas law negating an inquiry into each individual deduction.  The authority cited by Plaintiffs is not persuasive as it was applying Oregon law to the issue of a valid authorization. Plaintiffs fail to cite any Kansas authority that supports their position that any deduction would automatically be invalid because it was agreed to in contract identifying an employee as an independent contractor.  Rather, Kansas law would require a determination as to whether the individual expressly authorized such deduction. *Blair*, 309 F. Supp. 3d at 1015–16 ("In doing so, an individual inquiry must be made as to whether the class members who were assessed transaction fees expressly authorized the fees, and then whether each individual fee was to the employee's benefit.")

Recognizing that their argument may not be successful, Plaintiffs assert that the fact that they authorized deductions would not compel denial of class certification because the existence of a signed authorization is an affirmative defense under the KWPA and therefore, it should not defeat class certification.  (Doc. 144 at 41, n. 35.)  While an affirmative defense does not necessarily preclude class certification, it is a relevant factor to consider.  *See Blair*, 309 F. Supp. 3d at 1015 (decertifying a KWPA in part based on whether the deductions were authorized); *Dukes*, 131 S. Ct. at 2551–2552 ("[T]he class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."); *Payne v. Tri-State CareFlight, LLC*, 332 F.R.D. 611, 669 (D.N.M. 2019) (citing cases).  As a result, an individual inquiry must be made as to whether the class members who had wages deducted—for any reason— authorized those deductions and then an inquiry must be made as to whether each deduction was to the employee's benefit. *Blair*, 309 F. Supp. 3d at 1015–16.  These issues require individualized questions related to causation.  Plaintiffs' argument on these issues fails to meet their burden. Rather, Plaintiffs merely state that the "remaining questions require only a comparison between

the deductions TransAm takes, the language and policy consideration of the KWPA and its regulations, and the compensation the drivers' received."  (Doc. 144 at 41.)  Plaintiffs fail to acknowledge that those questions are highly individualized and require the review of almost two thousand individuals' weekly settlement statements to determine what deductions were made and whether those deductions were lawful.  In *Blair*, the court decertified a class action based on a policy involving a deduction of a transaction fee for cash and fuel advances due to the individual issues regarding authorization and whether the deduction was for the employee's benefit.  309 F. Supp. 3d at 1016.  Here, Plaintiffs lump all of the deductions together in an unlawful policy even though they executed authorizations.  While the court recognizes that some deductions may be unauthorized under the KWPA given the nature of those deductions, Plaintiffs have made no attempt to specifically identify which deductions are at issue for the entire class.  As a result, the court simply cannot determine that common issues predominate as to the KWPA claim with respect to unlawful deductions.  Rather, the issue of liability will require an individualized inquiry as to what deductions were taken for each class member and, further, whether those were authorized and lawful under Kansas law.  *Blair*, 309 F. Supp. 3d at 1016 (D. Kan. 2018) (finding that there is "no common proof . . . possible to demonstrate injury for all class members, because to determine whether or not a charge was authorized will require individualized proof.") (quoting *Midland Pizza, LLC v. Sw. Bell Tel. Co*., 277 F.R.D. 637, 642 (D. Kan. 2011)).

Further, with respect to the common issue of whether any deductions resulted in a driver being paid less than minimum wage, the court finds that Plaintiffs have not sufficiently established that the class as a whole was subjected to a common policy.  Plaintiffs also fail to show that there is common proof to demonstrate injury for all class members.  Rather, as argued by Defendants, the court will be required to undertake an individualized analysis as to each weekly settlement

statement for each class member.  Plaintiffs have not met their burden to show that certification of this class is appropriate.

The court finds that these individualized issues will predominate such that a class action on Plaintiffs' KWPA claim is not warranted.[17]

iv.     **TIL Class**

Finally, Plaintiffs seek to certify the TIL class and identify the proposed class as "all individuals who have executed [a] written lease, as defined by 49 C.F.R. § 376.2(e) with TransAm since February 10, 2017."  (Doc. 144 at 8.)  In response, Defendants argue that Plaintiffs cannot establish commonality and predominance as to their TIL claim.  The court has granted Defendants summary judgment as to various aspects of the TIL claim.  The following remain viable claims under the TIL: improper escrow funds; requirement to purchase physical damage insurance; deduction of amounts for physical damage insurance and other products that are different than those amounts set forth in the lease; and the negative fuel surcharges.  After review, the court finds that Plaintiffs' TIL claims as to the escrow funds and physical damage insurance are not appropriate for certification as individual issues predominate.  The court grants Plaintiffs' motion to certify the TIL claim as to the unlawful chargebacks for deductions that are different than those contained in the lease and the negative fuel surcharge.

a.  **Escrow Funds**

With respect to the alleged violations regarding the escrow funds, Plaintiffs contend that common issues of law and fact predominate their claim because all lease drivers executed the same lease agreements and the issue of whether those agreements complied with the TIL is the same for

---

[17] Defendants further argue that individualized issues would predominate the issue of whether the lease drivers were independent contractors or employees under Kansas law.  Because of this court's decision regarding TransAm's policy of unauthorized deductions, the court need not address this additional argument.

all class members.  Plaintiffs assert that individual questions of damages should not affect certification.  Defendants argue that individualized issues predominate the TIL claim because the court will be required to analyze the individual drivers' escrow accounts to determine whether each class member has been damaged by Defendants' practices.  (Doc. 150 at 23).  Those inquiries would include whether there was a balance in each escrow account, was the balance returned, and/or if Defendants' improperly deducted or offset any amounts from such escrow fund. Plaintiffs do not dispute that such individual inquiries will be required but instead argue that class certification is appropriate even in the face of individualized damages.  (Doc. 172 at 10.)

While there are certainly common issues of law and fact as to the terms of the ICA and ELA and whether those terms comply with the TIL regulations, the court finds that the individualized questions regarding damages predominate here.

While individual damages questions do not typically destroy predominance, the Supreme Court requires this court to take a "close look at whether common questions predominate over individual ones" when computing damages.  *Comcast Corp*, 569 U.S. at 34.  The Tenth Circuit has also instructed that a "district court should consider the extent to which material differences in damages determinations will require individualized inquiries."  *XTO Energy, Inc*., 725 F.3d at 1220.  "Although 'individualized monetary claims belong in Rule 23(b)(3)' . . . , predominance may be destroyed if individualized issues will overwhelm those questions common to the class." *Id.*  Here, as pointed out by Defendants, in order to prevail on a claim under the TIL, Plaintiffs must show that they sustained damages.  *See* 49 U.S.C. § 14704(a).  With respect to their claim regarding the escrow accounts, Plaintiffs have not put forth evidence that the putative class has common evidence regarding damages due to a failure to comply with the TIL regulations with respect to the escrow accounts.  Rather, the court will need to examine each escrow account to

determine whether a balance remained in that account, if the amounts were returned, and if there were improper deductions from the account. Further, Defendants argue that they intend to assert various defenses to deductions such as proof of offsets, advances, maintenance, and other expenses that were charged to the accounts. While the question of whether the terms of the lease violate the TIL is a common one, the question of whether each individual driver has in fact been harmed and the extent of that harm is highly individualized. In response, Plaintiffs cite to out of district cases in which class actions were certified notwithstanding highly individualized issues on damages. (Doc. 172 at 10.) Those cases, however, were decided prior to *Behrend*. Further, this court is bound by the Tenth Circuit which has held that highly individualized questions as to damages can destroy predominance. *XTO Energy, Inc.*, 725 F.3d at 1220.

In *Owner-Operator Indep. Drivers Ass'n, Inc. v. New Prime, Inc.*, the Eighth Circuit affirmed the district court's findings that individualized questions regarding damages destroyed predominance in a case with similar claims:

> As the district court pointed out, 49 U.S.C. § 14704(a)(2) provides a right to recover only to persons who have sustained damages as a result of a carrier violation. Therefore, neither Prime nor Success would be liable for returning funds if, for example, the Owner–Operator did not have a positive balance in his escrow account or the funds owed to the Owner–Operator were offset by other monies owed to Prime or Success. To make such determinations, a court would be required to examine each individual class member's account, including offsets, advances, and other items. Recovery for any plaintiff would be based on individual, not common, questions of fact. Therefore, we affirm the district court's denial of class certification, as we agree that questions affecting individual class members would predominate over common questions of law or fact.

339 F.3d 1001, 1012 (8th Cir. 2003).

Plaintiffs argue that this decision is an "outlier" and that the court should not follow the reasoning of the Eighth Circuit. (Doc. 172 at 10.) In support of their argument, Plaintiffs cite to *OOIDA v. Allied Van Lines, Inc.*, 231 F.R.D. 280, 284 (N.D. Ill. 2005). (Doc. 172 at 10.) In that

case, the court merely rejected the Eighth Circuit decision on the basis that individualized damages do not defeat certification.  This court is not persuaded by that decision, however, in light of the Eighth Circuit's holding and the more recent cases on damages and predominance.  *See Owner Operator Indep. Drives Ass'n, Inc. v. FFE Transp. Servs., Inc*., 245 F.R.D. 253, 256 (N.D. Tex. 2007) (denying class certification due to individualized damages questions on the TIL claim).

Plaintiffs also cite to *Fox v. TransAm Leasing, Inc*., in support of their motion for certification.  No. 12-2706-CM, 2014 WL 2604035, at *8 (D. Kan. June 11, 2014), *amended*, No. 12-2706-CM-GLR, 2014 WL 3519069 (D. Kan. July 16, 2014).  In that case, the court initially certified a TIL class based on a $15 satellite fee deduction taken from the drivers.  *Fox* does not help Plaintiffs here.  In *Fox*, the drivers were uniformly subjected to the same fee.  Therefore, the court found that there were no individualized inquiries to determine liability.  *Id.*  Further, contrary to this case, simple calculations could be done to determine the amount of damages.  In this case, Plaintiffs do not contend that there is a means to answer the question of injury and damages as to each putative class member without an individualized inquiry into each escrow account and the transactions pertaining to those accounts.

While there are common issues on this claim for the class, such as whether the terms pertaining to the escrow accounts violate the TIL, the court finds that "material differences in damages determinations" destroy predominance here because the "individualized issues will overwhelm . . . questions common to the class."  *Naylor Farms, Inc. v. Chaparral Energy, LLC*, 923 F.3d 779, 798 (10th Cir. 2019) (citing *Roderick*, 725 F.3d at 1220).

### b.  Requirement to Purchase Physical Damage Insurance

Next, Plaintiffs claim that the lease violates the TIL because Plaintiffs are required to purchase physical damage insurance from TransAm.  Under the TIL, a motor carrier may not

require a lease driver to purchase a product from the motor carrier.  Plaintiffs do not specifically address this part of their TIL claim in the motion for class certification.  Defendants argue that this claim also fails the predominance inquiry.

As with the other TIL claims, Plaintiffs all signed uniform leases with TransAm.  Because the proposed class all leased their trucks from ONE, they were required to purchase physical damage insurance from ONE.  Therefore, there are common issues of law and fact with respect to the terms regarding physical damage insurance and whether these terms violate the TIL.  While Plaintiffs have made a showing that such terms violate the TIL, Plaintiffs must also establish that they suffered damages as a result.  To do so, Defendants argue that each putative class member will have to show that they suffered economic damages by not being able to procure their own physical damage insurance from a third party.  (Doc. 150 at 23.)  Plaintiffs do not dispute this assertion and continue to argue that individualized damages cannot destroy predominance.  Further, Plaintiffs offer no evidence or argument as to whether there would be common evidence to support that the putative class was damaged by these terms, such as evidence that a third party charged a flat fee amount to drivers that was less than the amount the putative class was charged by TransAm.  Rather, as Defendants assert, the court must review evidence as to what insurance was available on the market for each putative class member at the time they began driving, whether that rate would change over time, and the coverages of that insurance, in order to determine whether each putative class member suffered damages as a result of having to purchase insurance from TransAm.  Further, Plaintiffs have made no attempt to put forth evidence showing that they

would have been able to procure physical damage insurance at a cheaper amount from a third party.[18]

While there are common issues on this claim for the class, such as whether the terms pertaining to the physical damage insurance violate the TIL, the court finds that the individualized issues on injury and damages will overwhelm those common issues.  *See New Prime*, 339 F.3d at 1012.

### c.  Improper Chargebacks

Next, Plaintiffs allege that the lease is in violation of the TIL regulations because of chargebacks in amounts that are different from the amounts stated in the lease and because of the negative fuel surcharges.  Besides generally arguing that individual issues predominate, Defendants do not make specific argument as to why these claims cannot be certified as a class action.

Under Rule 23(a)(1), the court first considers whether "the class is so numerous that joinder of all members is impracticable."  Here, the evidence is that there were at least 2,000 lease drivers who completed orientation from February 2018 to January 2022.  (Docs. 144-4 ¶ 35; 144-26.) Based on this evidence, the court finds that Plaintiffs have satisfied the requirement of Rule 23(a)(1).  *See Eatinger*, 271 F.R.D. at 258.

Next, under Rule 23(a)(2), Plaintiffs must establish that there are questions of law or fact common to the class.  Plaintiffs have identified common questions of law and fact including whether the chargebacks and negative fuel surcharges violated the TIL.  Based on the evidence, all lease drivers executed a standard form lease.  Further, they were all subjected to a fuel surcharge

---

[18] Although Plaintiffs have put forth evidence of Defendants' cost for the insurance on one particular policy, Plaintiffs have not set forth facts showing what their individual cost for physical damage insurance would have been had they been allowed to purchase that insurance from a third party.  (Doc. 144-4 ¶ 98; 144-46, Droescher Depo. at 128:1–23.)

for during certain months in 2020.  Given that the lease drivers all executed the standard form lease and were subjected to the same fuel surcharges, the court finds that there are common questions as to the entire class regarding the TIL claim on these issues.

Next, Plaintiffs must show that "the claims or defenses of the representative parties are typical of the claims or defenses of the class and the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(3)–(4).  To satisfy the adequacy requirement, the representative plaintiffs must be a member of the class, and "must show that (1) his interests do not conflict with those of the class members and (2) that he will be able to prosecute the action vigorously through qualified counsel." *Eatinger*, 271 F.R.D. at 260.  The named representatives of the TIL class are Reginald Bradley, Terrence Colvin-Williams, Carl McRoberts, and Kirk Roberts.  Because this court has determined that Bradley's TIL claim is barred by the statute of limitations, he is not a proper representative of the class.  With respect to the remaining three named Plaintiffs, Plaintiffs have alleged that they suffered improper chargebacks and set forth evidence of negative fuel charges and/or evidence of deductions in excess of the amounts set forth in the leases for the class representatives.  Therefore, the court finds that both Colvin-Williams, McRoberts, and Roberts have claims that are similar to the claims of the class.  There is no evidence that these named Plaintiffs have any fundamental conflicts with the proposed class members and Defendants do not offer any further objection to these named Plaintiffs' ability to represent the class.  Therefore, the court has no reason to doubt that Colvin-Williams, McRoberts, and Roberts will adequately and fairly represent and protect the interests of all members of the putative class.

Next, the court must determine whether Plaintiffs have established that common issues predominate over individual issues and that a class action is a superior method for adjudicating the

issues. Fed. R. Civ. P. 23(b)(3). Here, while there will be individual questions regarding damages, those questions will only require a review of the settlement statements and the leases to determine whether TransAm charged an amount in excess of the amounts stated in the leases. Further, with respect to the negative fuel surcharge, this will also require a review of the settlement statements during the months that a negative fuel surcharge was deducted from earnings. These individual questions will not predominate the common issues with respect to these claims as they merely involve mathematical computations which could be calculated by an expert. *Naylor Farms, Inc*., 923 F.3d at 798.

Rule 23(b)(3) also requires the court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The court looks to the four non-exclusive matters listed in Rule 23(b)(3) which are: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Here, there is no indication that the class members have an interest in individually bringing separate actions. According to Plaintiffs' counsel, there is no indication that similar litigation is currently ongoing in any other court. Further, this litigation has been ongoing for two years and the parties have already engaged in significant discovery although discovery has not yet concluded. There is no indication that a different forum would be more desirable.

With respect to this superiority factor, the Tenth Circuit has held that if class treatment will "achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable

results" then it is superior to other methods. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1096 (10th Cir. 2014). The other alternative here is for individuals to bring their own claims against TransAm. Because Plaintiffs will likely have minimal damages as this claim is only related to the differences in amounts billed and the negative fuel surcharges, they would be unlikely to bring such a claim. Further, prosecuting such individual claims would be "grossly inefficient, costly, and time consuming because the parties, witnesses, and courts would be forced to endure unnecessarily duplicative litigation." *In re Universal Serv. Fund Tel. Billing Pracs. Litig.,* 219 F.R.D. 661, 679 (D. Kan. 2004). Because Plaintiffs' claims are substantially similar and common issues will predominate, a class action is the most superior method for Plaintiffs to pursue their claims and it will avoid unnecessary and duplicative litigation.

Plaintiffs' motion to certify the TIL class is granted with respect to Plaintiffs' claims regarding improper chargebacks for certain products and the fuel surcharges.

### v.      Summary

Plaintiffs' motion to certify the TIL class is granted to the extent set forth herein. The TIL class includes all individuals who have executed a written lease as that term is defined by 49 C.F.R. § 376.2(e) with TransAm since February 10, 2017. Further, the class is limited to the claims pertaining to chargebacks for products, such as insurance, that are in excess of those amounts set forth in the lease, as well as chargebacks for negative fuel surcharges. The named class representatives of the TIL class are Colvin-Williams, Carl McRoberts, and Kirk Roberts. As stated herein, the court finds that these Plaintiffs are adequate class representatives.

The court further finds that Plaintiffs' counsel are adequate class representatives as they do not have conflicts of interest with the class and have demonstrated that they will prosecute the action vigorously on behalf of the class. Further, they have spent a significant amount of time

litigating this matter since its inception, have demonstrated that they have experience in handling class actions, and have knowledge of the applicable law.  In appointing current Plaintiffs' counsel as class counsel, the court has considered all of the factors set forth in Rule 23(g).

The parties must confer over the form and content of the notice that will be disseminated to the class action members.  Within 30 days of this order, the parties are to submit a proposed form of notice for the court's approval in accordance with Rule 23(c)(2)(B).  Defendants must provide Plaintiffs with the name, current or last known addresses, email addresses, and telephone numbers of all individuals who meet the definition of the class within 30 days of the court's approval of the form of notice.

## IV.   Conclusion

Plaintiffs' motion for conditional certification (Doc. 141) is GRANTED IN PART and DENIED IN PART.  Plaintiffs' motion to conditionally certify the Orientation and Lease Driver Collectives is granted.  Plaintiffs' motion to conditionally certify the Company Driver Collective is denied.

Plaintiffs' motion to certify (Doc. 143) is GRANTED IN PART and DENIED IN PART. Plaintiffs' motion to certify the TIL class is granted with respect to Plaintiffs' claims regarding improper chargebacks for certain products and the fuel surcharges.  It is denied in all other respects.

Defendants' motion for partial summary judgment (Doc. 158) is GRANTED IN PART and DENIED IN PART.  Defendants' motion is granted as to the following: the KCPA claim; the TIL claim against JHI and ONE; the TIL claim against TransAm as to certain alleged violations as set forth herein; the FLSA minimum wage claim as to company drivers is granted as to all Plaintiffs except Hubbard, Neal, and Coleman; and Bradley's TIL claim.

Plaintiffs' motion for partial summary judgment (Doc. 161) is DENIED.

Defendants' motion to strike (Doc. 170) is denied and Plaintiffs' motion to file a sur-reply (Doc. 198) is denied as moot.

IT IS SO ORDERED.  Dated this 28th day of September 2023.

__s/ John Broomes _____
JOHN W. BROOMES
UNITED STATES DISTRICT JUDGE